**Noor Begum KARIM, et al.**

v.

**FINCH SHIPPING CO. LTD., et al.**

**No. Civ.A. 94–4169.**

United States District Court,
E.D. Louisiana.

April 14, 2000.

*FINDINGS OF FACT AND CONCLUSIONS OF LAW*

FALLON, District Judge.

## I. BACKGROUND

Finch Shipping Company, Ltd. ("Finch") petitions this Court for exoneration and limitation of liability from damages sustained by Mr. Fazal Karim when he was injured while serving aboard Finch's vessel, the M/V LOUSSIO. Karim answers contesting exoneration and limitation of liability because he claims his injuries were caused by the negligence of Finch or by the unseaworthiness of the M/V LOUS-SIO, of which Finch had privity and knowledge. In addition, Karim has filed a claim in the limitation proceeding seeking maintenance and cure as well as damages under the Jones Act, general maritime law, international law, or other applicable law.[1]

The transnational nature of maritime activities often produces complex questions of jurisdiction, applicable law, or proper venue. The present case raises issues in each of these areas. A Bangladeshi seaman injured on the high seas aboard a Panamanian flagged vessel, owned by a Maltese corporation with its base of operations in Pakistan and managed by a Danish company, has filed an answer and claim in a limitation proceeding instituted by the foreign vessel owner in the Eastern District of Louisiana. Does the Court have jurisdiction over the limitation proceeding? What is the proper forum for this case? What law should the Court apply? The legal voyage begins with a review of the factual and procedural histories.

## A. FACTUAL HISTORY

Fazal Karim, a Bangladeshi citizen residing near Chittagong, Bangladesh, joined the crew of the bulk cargo vessel, M/V LOUSSIO, as a seaman/helmsman on January, 18, 1995. Prior to boarding the Panamanian flagged vessel in Rotterdam, Netherlands, Karim had passed an annual physical examination and had suffered no physical ailments. He signed shipping articles prepared and negotiated by the Bangladeshi government for the protection and benefit of Bangladeshi seamen.

Finch Shipping Company ("Finch") owned the M/V LOUSSIO. Finch, a Maltese corporation whose principal shareholder, Mohammed Ilyas Shaik, is a Pakistani citizen currently residing in the United Arab Emirates, acquired the M/V LOUSSIO from a Liberian corporation in January 1995. Upon acquiring the M/V LOUSSIO, Finch hired Overseas Shipping Agency of Chittagong, Bangladesh, to staff the crew of the vessel which consisted of Bangladeshi seaman and Pakistani officers. Finch also contracted with Alpina Shipping, a Danish management company based in Copenhagen, Denmark, to manage the daily operations of the vessel and to secure employment and voyage charterers for Finch.

1. This case came to trial on the liability phase before the Court without a jury beginning on January 24 and ending on January 25, 2000. After hearing the testimony and reviewing the exhibits and the relevant record, the Court renders the following findings of fact and conclusions of law. To the extent a finding of fact constitutes a conclusion of law, the Court adopts it as such. To the extent a conclusion of law constitutes a finding of fact, the Court also adopts it as such.

The M/V LOUSSIO engaged in "tramp" trade which involves transporting cargo at the direction of any interested charterer rather than committing to regular voyages for a particular charterer. The itinerary of the M/V LOUSSIO, therefore, depended upon who chartered the vessel and where the charterer directed the vessel to transport cargo. Finch did not decide where the M/V LOUSSIO sailed.

On August 4, 1995, the M/V LOUSSIO left Piraeus, Greece for a Gulf port to obtain a cargo of grain. While at sea off the coast of Bermuda, the crew prepared for the grain shipment by cleaning the holds of the vessel which had stored coal on the previous voyage from South Africa to Greece. This preparation included washing the sides and sweeping the bottom of the No. 7 hold.

At 8:00 a.m. on August 17, 1995, several crew members reentered cargo hold No. 7 to complete their cleaning operations. They remained in the hold until 10:00 a.m. when they suspended their activity and left the hold for morning tea. As the crew members departed, they tracked a mixture of coal dust and water on the ladder way.

To enter and exit the hold, crew members used a ladder way composed of three sections. The first section consisted of four rung-type ladders leading to several platform landings. In the second section, five step pads and a right-side hand railing allowed crewman to navigate a slope sheet that had been installed at a forty-five degree angle from the base of the third landing to prevent cargo from accumulating on the walls of the hold. The third section of the ladder way began at the base of the slope sheet and included a "pigeon hole" ladder that led vertically to the bottom of the hold. This portion of the ladder way consisted of steel sheet in which holes had been cut at twelve inch intervals to serve as rungs and handholds. Crewmen used this ladder way system to access eight of the nine cargo holds in the M/V LOUSSIO.

At 10:30 a.m., the crew members finished their morning tea and returned to cargo hold No. 7. Karim was the first crew member to reenter the hold. Wearing clean boots and gloves, Karim proceeded down the ladder way without incident until he reached the transition area between the slope sheet and the pigeon hole ladder. When making the transition from the sloped sheet to the pigeon hole ladder, his foot slipped causing him to lose his balance and fall some twenty to thirty feet to the bottom of the hold. Only Mokhlesur Rahman, a seaman/helmsman who followed Karim into the hold, witnessed the accident, and his view was partially obstructed.

Karim suffered severe injuries from his fall. He fractured his lumbar vertebrae and hip, pelvis, leg, ankle, heel, and wrist on his left side. Additionally, Karim suffered several herniated discs in his back and neck as well as a detached retina in his right eye.

Karim was moved by fellow crew members to a dry portion of the hold and eventually evacuated using a cargo hook to raise him vertically from the cargo hold on a canvas stretcher which lacked any support. The pain during this period was "unbearable." He was then taken to the ship's infirmary where he was placed on a cot. The second officer of the M/V LOUSSIO, acting as ship's medical officer, monitored his vital signs and administered aspirin and other non-narcotic medication to Karim because other pain medications, including codeine and morphine, had expired. Crew members visited Karim daily to turn and clean him. Because of his injuries, Karim was unable to use the bathroom independently and had to urinate and defecate with the help of crew members who came to his cot.

Captain Mohammed Yosuf notified the owner and manager of the vessel of Karim's situation and contacted the international medical service, C.I.R.M. Medical Italia, by telex for assistance. Although advised by telex from doctors in Rome to evacuate Karim, Captain Yosuf could not obtain helicopter service from Bermuda

because of an impending tropical storm. Captain Yosuf chose to proceed past the Bahamas and not to transfer Karim to Bermuda on a smaller vessel or to seek treatment in the Bahamas or Florida. Following discussions with the Coast Guard and doctors from C.I.R.M., Captain Yosuf directed the vessel to its New Orleans destination nine days hence. Throughout this time, Karim endured excruciating pain. His ordeal during this nine-day voyage to New Orleans was a window into Hell.

Up to this point, the United States had no connection to the chain of events surrounding Karim's injury or treatment. The matter involved injuries to a Bangladeshi seaman serving aboard a Panamanian flagged vessel sailing on the high seas of the Atlantic Ocean. As mentioned, the vessel was owned by a Maltese corporation with operations in Pakistan and was managed by a Danish company. Only when Mr. Karim was evacuated by helicopter to Jo Ellen Smith Hospital in Algiers, Louisiana, upon the arrival of the vessel in New Orleans, did the United States become involved. This involvement consisted of first medical services and next legal process. It is appropriate to turn first to the latter.

## B. PROCEDURAL HISTORY

The legal history of this case began on November 30, 1995 when Karim and his wife brought suit against Finch, Alpina Shipping, and several other parties in the Civil District Court for the Parish of Orleans, State of Louisiana.

Karim first invoked the protections of this Court on December 5, 1995 when he

sought to enjoin the Immigration and Naturalization Service from deporting him because of his debilitated condition and urgent need for medical care. (Civil Action No. 95–4021). The Court granted Karim's request for a temporary restraining order on December 5, 1995 and issued a preliminary injunction on December 15, 1995 preventing his deportation. On April 10, 1997, the Court dissolved the preliminary injunction finding that Karim's medical condition had improved and he was capable of travel. The Fifth Circuit Court of Appeals denied Karim's request for a stay pending his appeal. The preliminary injunction ended on April 15, 1997, and Karim was returned to Bangladesh.

On April 3, 1996, one year before Karim's return to Bangladesh, Finch instituted a limitation of liability proceeding in this court pursuant to 46 U.S.C.App. § 181 *et seq.* (Civil Action No. 96–1175).[2] The Court entered a monition and concursus restraining the prosecution of any state court claims and requiring all parties with claims against Finch to direct them to this Court. Karim filed an answer in this proceeding contesting Finch's right to exoneration and limitation and sought damages for his injuries under the Jones Act, 46 U.S.C.App. § 688, general maritime law of the United States, international law, or other applicable law. On October 16, 1996, this Court stayed the limitation proceeding and lifted the monition, and, after receiving an appropriate stipulation, allowed Karim to pursue his claims against Finch in state court while at the same time preserving Finch's right to seek limitation in this Court.[3]

2. Karim has pursued other litigation in this Court. On December 15, 1995, he filed an action against the M/V LOUSSIO *in rem,* Finch, and several additional defendants (Civil Action No. 95–4169). On December 20, 1995, Finch posted a security bond for the M/V LOUSSIO and the vessel was released from arrest on December 21, 1995 after plaintiff's counsel had an opportunity to conduct discovery. In April, 1997, the Court granted Karim's motion to voluntarily dismiss his claims and entered a judgment in favor of the defendants, thereby closing Civil Action No.

95–4169. The Fifth Circuit Court of Appeals affirmed this ruling on March 22, 1999. *See Karim v. Finch Shipping,* 177 F.3d 978 (5th Cir.1999).

3. On August 2, 1996, Karim dismissed his *in personam* claims against Finch and its insurer, Ocean Marine Mutual Assurance Company, but retained the *in rem* claims in this Court. On September 17, 1996, Karim dismissed the claims against the remaining defendants in this Court and in state court. Thus, multiple claims no longer existed.

On July 9, 1997, the Civil District Court for the Parish of Orleans found that Finch had insufficient contacts with Louisiana to allow that court to exercise personal jurisdiction over it. The Fourth Circuit Court of Appeals affirmed the ruling of the civil district court. *See Karim v. Finch Shipping Co., Ltd.,* 718 So.2d 572 (La.App. 4 Cir.1998). On November 25, 1998, the Louisiana Supreme Court denied review of the appellate court decision. *See Karim v. Finch Shipping Co.,* 729 So.2d 568 (La. 1998).

The limitation proceeding initiated by Finch on April 3, 1996 remains the only surviving action in this case (Civil Action No. 96–1175).[4] On May 17, 1999, Finch moved to dismiss its claim for limitation on the grounds of lack of personal jurisdiction, res judicata, and forum non conveniens. Alternatively, Finch moved for summary judgment on Karim's penalty wage claim brought pursuant to 46 U.S.C. § 10313. Finch's motion to dismiss its limitation proceeding was denied. Karim had filed an answer and claim in response to Finch's voluntary, albeit defensive, petition for exoneration and limitation of liability. The Court found that it was inappropriate to allow Finch to unilaterally dismiss the proceeding into which an answer and claim had been filed.[5] The Court, however, granted summary judgment on Karim's penalty wage claim and dismissed that portion of the suit.

## II. LIABILITY

The Court now considers the limitation proceeding brought by Finch and the an-

swer and claim filed in this proceeding by Karim.[6]

## A. JURISDICTION

Limitation of a ship owner's liability is a universal concept among nations that recognize the potentially perilous nature of maritime transportation.[7] United States courts initially rejected the idea of limitation of liability, but Congress adopted the concept with the rise of the American merchant marine. *See* Grant Gilmore & Charles L. Black, Jr., *The Law of Admiralty* 818–19 (2nd ed.1975); *see also The Rebecca,* 20 F.Cas. 373 (D.Me.1831).

■ In the mid-Nineteenth Century, Congress passed the original Limitation of Vessel Owner's Liability Act (the "Limitation Act") to encourage shipbuilding and investment in this industry. *See* Act of Mar. 3, 1851, ch. 43, § 1, 9 Stat. 635 (current version at 46 U.S.C.App. § 181, *et seq.* (1999)); *Beiswenger Enterprises Corp. v. Carletta,* 86 F.3d 1032, 1033–34 (11th Cir. 1996). Under this Act, a vessel owner when faced with liability for a maritime accident may invoke the jurisdiction of a federal court by posting adequate security and filing a petition for limitation of liability. *See* 46 U.S.C.App. § 183. The security serves as the *res* which gives the Court *in rem* jurisdiction. Provided that the accident in question occurred without the vessel owner's "privity or knowledge," the Limitation Act limits the owner's liability to the value of the owner's interest in the vessel and its pending freight. *Id.* The

---

**4.** Karim brought an additional complaint against Finch and its insurer in this Court on August 17, 1998 for claims similar to those made in its original federal court action (Civil Action No. 95–4169). Considering the deadline for filing claims set in the Court's April 4, 1996 monition in the limitation proceeding (Civil Action No. 96–1175), the Court dismissed Karim's claims filed in Civil Action No. 98–2437 and entered a judgment on December 29, 1998.

**5.** While Finch raised its exoneration and limitation claim in defense of potential claims against it, Finch voluntarily chose to invoke

the protections of this Court and correspondingly subject itself to this Court's jurisdiction. In December, 1998, the Court denied additional claims by Karim in federal court because of the monition and concursus entered by the Court on Finch's behalf (Civil Action No. 98–2437).

**6.** The Court dismissed Karim's wife's claims for lack of evidence and proof.

**7.** For a review of the history of limitation see James J. Donovan, *The Origins and Development of Limitation of Shipowners' Liability,* 53 TUL. L.REV. 999 (1979).

tragic sinking of the Titanic established the rule that foreign vessel owners may also seek relief under the United States Limitation Act regardless of where the accident occurred. *See Ocean Steam Navigation Co. Ltd. v. Mellor* (The Titanic), 233 U.S. 718, 731, 34 S.Ct. 754, 58 L.Ed. 1171 (1914).

■ Federal district courts have exclusive jurisdiction to determine whether a vessel owner is entitled to exoneration from or limitation of liability. *See* 46 U.S.C.App. § 185; Fed.R.Civ.P. Rule F; *Langnes v. Green,* 282 U.S. 531, 540, 51 S.Ct. 243, 75 L.Ed. 520 (1931). After a vessel owner deposits with the district court an amount representing the value of the vessel and its freight (the limitation fund), the district court upon request stays all related claims against the vessel owner pending in other forums and directs all potential claimants to file their claims before the district court within a specific period of time. *See* 46 U.S.C.App. § 185; Fed.R.Civ.P. Rule F(3)-(4). Once the damage claims have been filed, the court proceeds to resolve the exoneration and limitation claim, and if appropriate, distributes the proceeds of the limitation fund.

In the present case, Finch filed for exoneration and limitation and posted a bond. This gave the Court a *res* over which to exercise *in rem* jurisdiction. Finch now argues that this Court no longer retains jurisdiction over its limitation action. Because Karim chose to pursue his claims in state court, and that court dismissed his claims for lack of personal jurisdiction, Finch contends there is no need to continue with its limitation proceeding.

Finch's argument misses the mark. Karim's claims in state court were *in personam* claims. The state court did not consider the merits of the claims and only held that it had no *in personam* jurisdiction. The limitation proceeding in this Court, however, is an *in rem* proceeding. The Court has *in rem* jurisdiction over the *res* or bond which was posted by Finch when it instituted its limitation action. The fact that a state court, or for that matter even this Court, lacks *in personam* jurisdiction does not deprive this Court of its *in rem* jurisdiction.

It now appears that Finch has changed its mind and would prefer to abandon its limitation proceeding without prejudice and quietly float away. The Court cannot permit this. When Finch filed for limitation, it exercised the Court's injunctive powers to prohibit the filing of any claims against it and to stay all claims previously filed outside of the limitation proceeding. Finch's action stopped Karim from proceeding in another forum and required him to file an answer and a claim in this limitation proceeding. This answer and claim must now be processed. It is anomalous that Finch, who originally sought a safe harbor by invoking United States law, now argues that United States law should not apply. This Court has a responsibility to provide a complete remedy to satisfy the answers and claims filed in Finch's limitation proceeding pursuant to its requested monition. *See Just v. Chambers,* 312 U.S. 383, 386-87, 61 S.Ct. 687, 85 L.Ed. 903 (1941); *Hartford Accident & Indemnity Co. v. Southern Pacific Co.,* 273 U.S. 207, 217, 47 S.Ct. 357, 71 L.Ed. 612 (1927).

■ In moving forward in this limitation proceeding, the Court applies United States law because limitation is a procedural right governed by the law of the forum. *See Mellor,* 233 U.S. at 733, 34 S.Ct. 754. Two questions must be answered to determine whether Finch is entitled to limit its liability in this case. "First, the court must determine what acts of negligence or conditions of unseaworthiness caused the accident. Second, the court must determine whether the shipowner had knowledge or privity of those same acts of negligence or unseaworthiness." *Beiswenger Enterprises Corp.,* 86 F.3d at 1036. The damaged claimant bears the initial burden of establishing liability and the vessel owner then bears the burden of establishing lack of privity and knowledge.

■ The facts reveal that as Karim descended the ladder way, he reached the transition between the step portion of the ladder and the pigeon hole portion of the ladder. With his left foot on the last step and his right foot in the pigeon hole, Karim testified that he caught his right hand in a bent portion of the hand rail. While attempting to free his right hand, he leaned forward and his left foot slipped on wet coal dust. He lost balance and fell. A fellow crew member, who was on the ladder and saw Karim fall, testified that Karim had passed the hand rail portion of the ladder when his foot slipped, causing him to lose his balance and fall. Whether Karim's hand became stuck in the portion of the ladder is uncertain, but it is certain that his foot slipped due to the slippery condition of the ladder steps and that this was the proximate cause of his fall.

This condition resulted from the negligent actions of fellow crew members in tracking coal dust onto the rungs of the ladder or failing to remove it. This circumstance also rendered the ladder unseaworthy. This negligent and unseaworthy condition, however, was without privity or knowledge of Finch. Thus, the answers to the above questions are that Karim's injuries were caused by Finch's negligence or the vessel's unseaworthiness and that Finch had no privity or knowledge of the negligent acts and unseaworthiness. Therefore, Finch's claims for exoneration are denied, but limitation is granted. This conclusion, however, does not end this legal voyage. This Court has a responsibility with regard to distribution of the limitation fund.

## B. CHOICE OF LAW

■ While United States law governs the procedural issues of the limitation proceeding, this Court must decide what substantive law applies to the underlying cause of action. The fact that United States law determines limitation does not automatically mean that United States law should supply the substantive law for the underlying claim. *See Mellor*, 233 U.S. at 732–34, 34 S.Ct. 754 (applying United States law for limitation and British law to the underlying tort claim). The nations implicated in this case are truly diverse; they include: Bangladesh, Denmark, Malta, Panama, and Pakistan. Mr. Karim insists that United States law should apply as the law of the forum while Finch contends that the law of Bangladesh or another nation implicated in the case should govern the underlying substantive dispute.

■ The Court decides a choice of law inquiry in a maritime injury case by following the *Lauritzen–Rhoditis* test. *See Hellenic Lines, Ltd. v. Rhoditis*, 398 U.S. 306, 90 S.Ct. 1731, 26 L.Ed.2d 252 (1970); *Lauritzen v. Larsen*, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953). Under the *Lauritzen–Rhoditis* test, the Court considers several factors to determine what law applies: (1) the location of the injury, (2) the law of the flag, (3) the domicile of the injured party, (4) the allegiance of the shipowner, (5) the place of the contract, (6) the inaccessibility of a foreign forum, (7) the law of the forum, and (8) the base of operations of the shipowner. *See Coats v. Penrod Drilling Corp.*, 61 F.3d 1113, 1119 (5th Cir.1995). "The test is not a mechanical one in which the court simply counts the relevant contacts; instead, the significance of each factor must be considered within the particular context of the claim and the national interest that might be served by the application of United States law." *Fogleman v. ARAMCO*, 920 F.2d 278, 282 (5th Cir. 1991).

■ In this case, the injury occurred on the high seas off the coast of Bermuda. The vessel flew a Panamanian flag and was owned by a Maltese corporation which maintained a base of operations in Pakistan. Karim is a resident and citizen of Bangladesh who contracted with Finch when signing shipping articles in Bangladesh. The Bangladesh government solicited and negotiated Karim's employment on the vessel. In addition, the Shipping Articles afforded Karim a choice of pursuing a claim under Bangladeshi workers' compensation laws or instituting a civil suit

for damages. *See* Def.'s Ex. 1. Furthermore, Karim, who is permanently disabled from seaman's work, presently resides in Bangladesh. Bangladesh clearly has a greater interest than any other nation involved in this dispute.

While Karim contests that the United States has at least as great of an interest as Bangladesh because it is the host forum, the Court finds that the relationship of the United States to this case is merely fortuitous. The vessel could have docked in Bermuda or the Bahamas. The fact that she came to New Orleans instead cannot, in and of itself, be the basis for determining the substantive law. If this were the case, the choice of law analysis directed by the Supreme Court in the *Lauritzen–Rhoditis* test would prove meaningless. "[F]oreign law applies because American law clearly does not." *Gonzalez v. Naviera Neptuno A.A.*, 832 F.2d 876, 880 (5th Cir.1987). Because Bangladesh's interest predominates over those of the other involved nations, its law should apply to Karim's tort claims.

It is tempting at this point for the Court to simply close this case, i.e. dismiss it with a conditional transfer to a Bangladeshi court. *See Baris v. Sulpicio Lines, Inc.*, 932 F.2d 1540, 1551 (5th Cir.1991) (holding that courts should impose conditions on the transfer of cases to other forums that include assurances that the plaintiff will be able to bring their claim in the receiving jurisdiction). After all, everything must end, particularly a four year-old case. Moreover, the prospect of divining the applicable Bangladeshi law seems daunting. But, is transfer the appropriate action in this case?

## C. FORUM NON CONVENIENS

 Finch argues that this Court is not the most convenient forum to entertain Karim's claims. Therefore, the case should be dismissed on the grounds of forum non conveniens. The doctrine of forum non conveniens rests upon a court's inherent power to control the parties and cases before it and to prevent its process from becoming an instrument of abuse or injustice. Through this power, a federal district court may decline to exercise its jurisdiction, even though the court has jurisdiction and venue, when it appears that the convenience of the parties and the court and the interests of justice indicate that the case should be tried in another forum. *See Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981); *Koster v. Lumbermens Mutual Cas. Co.*, 330 U.S. 518, 67 S.Ct. 828, 91 L.Ed. 1067 (1947); *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947); *In re Air Crash Disaster Near New Orleans*, 821 F.2d 1147, 1162 (5th Cir.1987); *See generally* Edward L. Barrett, *The Doctrine of Forum Non Conveniens*, 35 CAL. L.REV. 380 (1947); Alexander Bickel, *The Doctrine of Forum Non Conveniens as Applied to Federal Courts in Matters of Admiralty*, 35 CORNELL L.Q. 12 (1949); Michael Butterworth, *Forum Non Conveniens – The Fifth Circuit's New Test Collides with Admiralty Law*, 13 TUL. MAR. L.J. 179 (1988). Under the forum non conveniens doctrine, the moving party bears the burden of establishing that an adequate and available forum exists as to the parties, and that both private and public interests weigh heavily on the side of trial in the foreign forum. *See In re Air Crash Disaster Near New Orleans*, 821 F.2d at 1164.

At first blush, this case appears appropriate for dismissal on the grounds of forum non conveniens. The case, after all, involves a Bangladeshi plaintiff injured on the high seas aboard a Panamanian flagged vessel owned by a Maltese corporation with its base of operations in Pakistan. The United States became involved in this case only after Karim was treated here for his injuries which treatment began more than a week after his accident. On the other hand, the parties in this case have been before this Court for more than four years in several different causes of action. Much of this time was spent litigating in state court and preparing for and trying the limitation proceeding which Finch filed in this Court. Finch made a timely motion to dismiss for forum non

conveniens, but the Court could not consider the issue of forum non conveniens until Finch's claim for limitation of liability was resolved. This Court was the most convenient forum to resolve limitation issues because a limitation proceeding is governed by the law of the forum. *See Mellor,* 233 U.S. at 733–34, 34 S.Ct. 754. Now that the question of exoneration and limitation of liability has been resolved, the Court may focus on the forum non conveniens issues.

While Bangladesh at one time may have been an available, adequate and convenient forum to try the present case, the situation has changed. First, consider the private interest factors. The vessel itself has been scrapped. She no longer exists. The photographs and video-recordings that memorialize her for this litigation are kept here and were made by witnesses available here. Karim received his medical treatment in this jurisdiction. The only marine surveyor who saw and inspected the vessel resides here. Depositions of all the fact witnesses have been taken in this proceeding. Many of these witnesses are no longer accessible. Counsel for both parties are based in this forum, and a transfer of this case to another forum would entail tremendous expense and logistical prowess from both parties since much of the evidence would have to be translated and reassembled in accordance with other procedures. Finally, the limitation case has already been tried in this Court and all of the evidence is in this Court's record.

■ Next, consider the public interest factors. The parties have litigated before this Court for more than four years. Although the Court finds that it must apply the law of Bangladesh to substantive claims of this litigation, "the need to apply foreign law is not alone sufficient to dismiss under the doctrine of foreign non

conveniens." *R. Maganlal & Co. v. M.G. Chemical Co., Inc.,* 942 F.2d 164, 169 (2nd Cir.1991). Both the private and public factors favor litigation in this forum. Moreover, the Court also notes that Finch, the only remaining defendant in this case, is a defunct corporation that no longer exists. Finch thus could not be served, could not participate in litigation, nor could Finch satisfy any judgment against it in another court. Karim only may recover from Finch in this Court because of the security Finch posted in this proceeding. If the Court removes this case to another jurisdiction, it may well remove any possibility Karim has for executing a potential judgment against Finch. Thus, there is a serious question as to whether a Bangladeshi forum is available and adequate to resolve the issues in this case, and the defendant has failed to carry its burden in this regard. Such a situation dictates keeping the case in this Court. *See In re Air Crash Disaster Near New Orleans,* 821 F.2d at 1165.

■ Therefore, the Court finds that both the private and public interest factors demonstrate that no other forum is adequate, available or more convenient that this Court to entertain the present litigation. Accordingly, this Court will resolve this matter pursuant to Bangladesh law. *See In re Oil Spill by the Amoco Cadiz,* 954 F.2d 1279, 1324–25 (7th Cir.1992) (holding that a shipowner may argue foreign substantive law even when its claim for exoneration and limitation liability is denied).

### III. QUANTUM

The Court, having found that Karim's injuries were proximately caused by Finch's negligence, now considers the appropriate measure of Karim's damages under the law of Bangladesh.[8]

---

**8.** Following the trial on the limitation and liability phase of this matter, a trial was held on the quantum aspect of the case. The parties were afforded an opportunity to offer relevant material and sources concerning the substantive law of Bangladesh. *See* Federal Rules of Civil Procedure, Rule 44.1; *see generally* 9 Charles Alan Wright & Charles R. Miller, *Federal Practice and Procedure* § 2441 (1999). The Court also heard expert testimony and argument from B.K. Agnihotri, Chancellor of Southern University Law School, attorney, and former trial judge in India, as

## A. BACKGROUND

To understand the development and current status of the Bangladeshi legal system, as well as the cultural underpinnings that explain its tort award structure, it is helpful to briefly review the historical origins of Bangladesh. The country which is now called Bangladesh is part of Bengal, the northeastern portion of the Indian subcontinent. It boasts a rich cultural past combining Dravidian, Indo–Aryan, Mongol, Arab, Persian, Turkish and Western European cultures.

The earliest reference to the region was a kingdom called Vanga, or Banga. Buddhists ruled the area for centuries, but by the Tenth Century, Bengal was primarily Hindu. In 1576, Bengal became part of the Mogul Empire, and the majority of the East Bengalis converted to Islam. The area was then subsumed by the British Empire in the late Eighteenth Century. Britain governed the region from 1757 until it withdrew in 1947 and created the states of India and Pakistan. Pakistan was formed out of the two predominantly Muslim regions of the Indian subcontinent: West Pakistan and East Pakistan, the eastern portion of Bengal, formerly known as East Bengal. Although West Pakistan and East Pakistan were united by religion (Islam), their people were separated by culture, physical features, and 1000 miles of Indian territory. In 1971, East Pakistan seceded from Pakistan and became the Republic of Bangladesh.

Today, Bangladesh is an independent republic within the British Commonwealth. Its population of 127,117,000 spans an area of 55,598 square miles (about the size of Wisconsin) and lives to an average age of 60.6 years. Although one of the world's poorest and most densely populated countries, Bangladesh continues to feed its rapidly increasing population by producing food domestically and by importing food from abroad. Its predominantly agrarian economy provides an average annual income to its residents of approximately $354.00, or less than $1.00 per day.

The law of torts in Bangladesh, as well as in India and Pakistan, is based on the rules of English Common Law. *See* C. Kameswara Rao, *Law of Damages and Compensation*, 8 (3d ed. 1959) (Def.'s Ex. 47, Tab 4). The laws that were prevalent during the period of British India continued in India and Pakistan following independence from Britain in 1947. Similarly, the laws prevalent in Pakistan continued after secession of Bangladesh in 1971. *See* Bangl. Const. art. 149 (Constitution of the People's Republic of Bangladesh) (Def.'s Ex. 47, Tab 1). When there are gaps or even a scarcity of Bangladeshi legal authority or precedent on any topic, the Bangladeshi courts routinely look to the court decisions of India, Pakistan or England. *See* Ramaswamy Iyer, *The Law of Torts* 57 (7th ed. 1975) (Def.'s Ex. 47, Tab 3).

The legal system of Bangladesh affords employees (including seamen) who are injured in the course of their employment a choice of either proceeding under the Workmen's Compensation Act before a commissioner or filing a tort claim in a civil court. *See* Def.'s Ex. 45 at 3. These remedies are mutually exclusive so that the pursuit of one forecloses the right to pursue the other. In the present case, had Karim pursued (or been eligible to pursue) a worker's compensation remedy, he would have been entitled to recover Taka 184,240 ($3,684.80). *See* Def.'s Ex. 1, art. 16, at 9. Karim, however, did not pursue a worker's compensation remedy. Instead, he filed a tort claim in civil court seeking monetary damages resulting from his physical injuries.

Physical injuries as a result of negligent conduct are not rare occurrences in Bangladesh, but few injured persons file tort claims in the Bangladeshi courts. The Indian, Pakistani and Bangladeshi law re-

well as two distinguished members of the Bangladeshi Bar, Ajmalul Hossain, Q.C. and Dr. M. Zahir. These expert witnesses testified to the issue of quantum and were very knowledgeable in the laws of Bangladesh, India, and the United Kingdom.

ports contain a dearth of tort cases. Legal scholars postulate that injured persons fail to assert their legal rights because of insufficient appreciation of such rights, difficulties in proving claims and obtaining trustworthy testimony, and concerns regarding the high fees and delays of Bangladeshi courts. *See* Iyer, *supra*, at 23.

## B. ELEMENTS OF DAMAGE UNDER BANGLADESHI LAW

■■■ Bangladeshi tort law recognizes the following elements of damage: medical expenses, pecuniary loss ("real damages"), pain and suffering ("general damages"), nominal damages, aggravated damages, and exemplary ("punitive") damages. In addition, litigation costs including attorney's fees, may be allowed at the discretion of the court. *See Serajul Islam Chowdhury v. Jainal Abedin*, 49 DLR (AD) 164 (1997) (Def.'s Ex. 48, Tab 1); Rao, *supra*, at 21–22. An examination of each of these elements will determine the appropriate damage award for Karim under Bangladeshi tort law.

### 1. MEDICAL EXPENSES

■■■ Bangladeshi law allows recovery of past, present and future medical expenses incurred as a result of negligence. *See* Def.'s Ex. 45 at 5. In this case, Karim required extensive medical treatment for the injuries sustained aboard the M/V LOUSSIO. When the vessel arrived in the Mississippi River on August 26, 1975, Karim was flown to Jo Ellen Smith Hospital in New Orleans. On his admission to Jo Ellen Smith, he was initially diagnosed as having fractures of the left hip, pelvis, lumbar spine, left wrist, left ankle & heel. Subsequent examinations revealed ruptured intervertebral discs in both the lumbar and cervical spine as well as a detached retina in the right eye.

Karim underwent numerous surgical procedures on his hip, back, ankle and wrist, including a cervical and lumbar lami-

nectomy and fusion. Doctors also attempted to repair his right eye through extensive surgery, but the operations failed to save Karim's sight in that eye. For his various injuries, Karim underwent an extended period of inpatient care and outpatient treatment.

■■■ Karim received his medical treatment from American doctors and hospitals and convalesced in the United States. When medical services are received in a foreign country, Bangladeshi law allows recovery for the amount charged or incurred in that country without attempting to determine its cost in Bangladesh. *See Karnataka State Road Transp. Corp. v. R. Sethuram*, A.C.J. 1022 (Karnataka H.C. 1996) (Def.'s Ex. 36, Tab 6). The total past medical expense is $316,710.10. Finch has paid $204,667.69 of this expense, leaving an outstanding balance of $63,668.16 due and owing for past medical expenses.[9] The evidence supports the conclusion that these medical expenses were necessary and that the amount is reasonable. Thus, the defendant is liable for the outstanding balance of $63,668.16.

In addition to the past medical expenses, the evidence reveals that Karim will need future medical care. Karim returned to live in Bangladesh in April, 1997 and has continued to have some pain, particularly in his right eye. He will likely require future treatment consisting of the removal of his right eye and another procedure on his foot. There is no evidence as to the expected cost of this care, or even its availability, in Bangladesh. Nevertheless, the evidence indicates that the cost of this care in the Untied States would be $20,000. Accordingly, this amount will be allowed for Karim's future medical expense.

### 2. LOSS OF WAGES

Bangladeshi law also provides compensation for loss of wages as a result of negligence. *See* Def.'s Ex. 45 at 5. At the

---

9. The additional difference between the amount paid and the amount owing reflects discounts from medical providers and other arrangements made between the parties.

time of his injury, Karim was 41 years of age, earned a yearly base wage of Taka 89,448 (approximately $1800.00), plus overtime for a total annual wage of Taka 186,500 ($3,730.00). As a result of his injuries, Karim is totally and permanently disabled.

The parties have stipulated that the report of economist Kenneth J. Boudreaux, Ph.D., accurately portrays the unrebutted past and future income loss. *See* Pl.'s Ex. 15. Bangladeshi law allows recovery for the loss of income resulting from personal injury due to the negligence of another. *See* Dr. Durga Das Basu, *The Law of Torts* 65 (10th ed. 1988) (Def.'s Ex. 47, Tab 2). Based on the testimony and Dr. Boudreaux's report as evidence of Karim's income loss, the Court finds that Karim's past loss is Taka 654,064 ($13,081.28) and the future loss is Taka 1,322,585 ($26,451.70), constituting a total past and future wage loss of Taka 1,976,649 ($39,532.98).

### 3. PAIN AND SUFFERING

Karim endured and continues to endure significant physical and mental pain as a direct result of the injuries he suffered aboard the M/V LOUSSIO. His travail invokes memories of Job's ordeal. Although he is clearly entitled to monetary damages as economic compensation for his hardship, the seminal question for the Court is by what standard should these damages be measured.

Karim argues that the value of general damages is universal and should be measured the same regardless of where a person lives because these damages are non pecuniary losses and are not dependent on economic circumstances. Karim then suggests that this Court should evaluate his general damages in the same way it would determine damages for a resident of the United States. While this argument is appealing at first blush, it relies upon a false premise and is not empirically supported.

Karim falsely assumes that general damages can be measured without regard to context. The monetary evaluation of a non pecuniary loss, such as pain and suffering, is a philosophical and policy exercise more than a legal or logical one. Happiness has no medium of exchange. No market exists for pain and suffering. The only requirement for an award of general damages is that the award be fair and reasonable according to facts and circumstances. Thus, the monetary worth of non pecuniary damage is contextual, not universal or perpetual. Its value depends upon time and place.

Damage awards from tort cases in the United States during the 1930's 1940's and 1950's demonstrate the significance of time on general damage awards. In the 1930's for example, a twenty-eight year old who sustained a compound comminuted fracture of the left leg, which resulted in amputation of the leg below the knee, was awarded $6,000. *Martin v. Toye Bros. Yellow Cab Co.*, 162 So. 257 (La.App.1935), *aff'd* 164 So. 175 (La.App.1935). In the 1940's, a minor was awarded $3,250 for a crushed foot. *See Walsdorf v. Perrett*, 23 So.2d 782 (La.App.Orleans1945). In the 1950's, a twenty year old fire department captain who lost his eye, sustained a brain concussion, and suffered various other injuries was awarded $2,500 for pain and suffering. *See McDowell v. Nat'l Sur. Corp.*, 68 So.2d 189 (La.App.1953). The paltry amounts of these earlier awards, compared to current standards for pain and suffering, illustrate differences in the value of general damage awards and not differences in the amount of pain suffered by United States tort victims.

Moreover, the value of general damages differs according to place just as it differs according to time. General damage awards in Bangladesh differ from awards in the United States not because Bangladeshi residents suffer any less than American residents but because Bangladesh values general damages differently. To utilize the quantum standards of the United States simply because Karim obtained medical treatment in this country is neither justified nor appropriate. Karim

is a Bangladeshi citizen who lives in Bangladesh. Bangladeshi law is applicable, not the law of the United States. This Court must, therefore, determine what a Bangladeshi resident such as Karim would receive in general damages under Bangladeshi law.

In Bangladesh, Karim's civil action would be tried by a judge without a jury. Bangladeshi judges customarily refer to comparable cases for guidance in fixing the amount of general damages. *See* Iyer, *supra,* at 57. Following this procedure, a Bangladeshi court would first look to Bangladeshi case law. A review of the Dhaka Law Reports for tort cases, however, reveals a dearth of case law reporting general damage awards. In fact, the Dhaka Law Reports has published only two opinions from Bangladeshi courts considering tort claims.

In *Awal v. Ahmed,* a principal of Dacca college was injured when a piece of building material fell from a scaffold and hit his feet, fracturing three toes on his right foot and lacerating his left foot. 27 DLR 628 (1975) (Def.'s 47, Tab 14). He remained an indoor patient for a month and was disabled for five to six months thereafter. *See id.* at 630. Although the incident in *Awal* occurred in 1958, the case did not proceed to trial until 1965. In 1975, the appellate court issued its opinion and awarded Taka 15,000 ($300) for physical and mental pain.

*Serajul Islam Chowdhury v. Jainal Abedin* involves a tort claim for damages due to trespass. 49 DLR (AD) 164 (1997). The plaintiff and defendant were owners of adjoining yards in which ships were dismantled for scrap. A feud developed between the parties and culminated when the defendant intentionally and with malice beached a vessel in plaintiff's yard causing disruption of business and mental pain and suffering. Although the appellate court recognized the availability of special, general, and punitive damages in tort cases, it concluded that the evidence in this case did not support a damage award other than for nominal damages. *See id.*

Neither of these cases is directly relevant to the quantum issues in the present case. The *Awal* case occurred over forty years ago, and the *Chowdhury* case involved the tort of trespass. When there is a paucity of Bangladeshi or Pakistani precedent, as there is on the issue of general damage awards, it is common practice for Bangladeshi courts to turn to the case law of the United Kingdom or India. Accordingly, this Court will look to the British and Indian courts for guidance in determining the appropriate damage award for Karim.

In Britain, like Bangladesh, civil cases are tried to a judge without a jury. To assist British judges in evaluating general damages in personal injury cases, the Judicial Studies Board-a judicial administrative office-has compiled quantum guidelines. *See* Judicial Studies Board, *Guidelines for the Assessment of General Damages in Personal Injury Cases* 9–47 (4th ed.1998–99) [hereinafter "Guidelines"] (Def.'s Ex. 47, Tab 6). The Guidelines suggest a general damage quantum range for various injuries. Courts are not constrained by the guidelines; instead, the Guidelines are intended as guides to assist a court in determining the appropriate amount for general damages.

The 1998–99 Guidelines for the quantum range for general damages, in pounds sterling, for the type injuries sustained by Karim is as follow:

| Injury | Low | High |
|--------|--------|--------|
| Ankle | £6,500 | £12,750 |
| Back | £18,500 | £30,000 |
| Eye | £26,000 | £30,000 |
| Heel | £12,190 | £18,600 |
| Neck | £25,000 | £25,000 |
| Pelvis | £18,500 | £24,000 |
| Thigh | £8,500 | £13,250 |
| Wrist | £6,000 | £11,750 |

Def.'s Ex. 50. For a case involving multiple injuries, it is customary for English judges to total the amounts for the various injuries to obtain the sum of the general damages. *See Brown v. Woodall* 1955 PIQR 36 (Def.'s Ex. 47, Tab 17); Def.'s

Ex. 45 at 4. The total of the amounts for these various injuries ranges from £121,-190 ($193,904) to £165,350 ($264,560). *See* Def.'s Ex. 50.

A review of the 1998 English cases confirms that English courts render general damage awards for similar multiple injuries within the parameters of the guidelines. For example, in *Bawden v. Gardner*, the plaintiff sustained a comminuted right distal tibia fracture and fractures of both medial and lateral malleoli, requiring a fixation pin to be applied through the heel. (1998) 98(6) Q.R (Def.'s Ex. 36, Tab 7). His right ankle had also been dislocated and there was damage to the arterial blood supply, requiring the placement of a plate and screws. He also suffered a pelvic injury involving multiple fractures. For these injuries, he was awarded general damages of £22,000 ($35,200).

In *Shone v. Rigby*, the plaintiff received a head injury involving a depressed fracture of the left parietal occipital region of the skull. (1998) 98(6) Q.R. (Def.'s Ex. 36, Tab 7). The dura was ruptured with herniation. Some of the brain was surgically removed. He was left with significant diminution of intellectual ability, particularly in relation to memory, learning, organization of information and concentration. The plaintiff also sustained a serious eye injury comprising total destruction of the left occipital cortex leaving loss of all field of vision out of both eyes. He was awarded general damages in the amount of £85,-000 ($136,000).

In *Davies v. Clarkson*, a 28 year old man sustained a brain injury, displacement of his left knee, a ruptured ligament in his right knee, and a broken collar bone. (1999) 11 C.I. 168 Q.B. (1999 WL 1111866). He underwent five operations on his left knee culminating in a total knee replacement. He is not able to walk more than 50 yards without extreme pain. His brain damage has caused him to lose 20 I.Q. points and to suffer severe depression and a deteriorated memory. He was awarded £50,000 ($80,000).

In *Samler v. Shaw*, a 17 year old female was injured in a car accident and sustained brain injuries, a fractured neck, facial injuries, and a smashed kneecap requiring removal. (1999) 10 C.L. 195 Q.B.(1999 WL 919114). As a result of the brain injury, her personality has been devastated. She has lost the sense of smell, is partially incontinent, and has lost the left field of vision in both eyes. Her condition is permanent. She was awarded £ 90,000 ($144,-000) as general damages.

Based on a review of the quantum guidelines, current English cases, and the testimony of the experts, the Court finds that a fair estimate of Karim's general damage under English law is between £125,000 ($200,000) and £175,000 ($280,-000).

In addition to consulting English legal authorities, Bangladeshi courts would also look to the courts of India for guidance. The court was directed to a plethora of Indian cases. The following were the most relevant for determining the range of damages in rupees (Rs.) typically awarded by Indian courts for general damages in cases involving similar injuries causing serious disability.

In *Ranjit Singh v. Beant Singh*, a 32 year old lost his right eye and was rendered permanently incapacitated. (1997) 759 (Punjab & Haryana) (Def.'s Ex. 36, Tab 5). He was awarded Rs. 40,000 ($1,000) for pain and suffering.

In *Basant Rai Saxena v. Madhya Pradesh State Road Transp. Corp.*, a person who sustained a fracture of the ulna bone of the right arm with residual disabilities received Rs. 25,000 ($625). (1997) 1236 (Madhya Pradesh) (Def.'s Ex. 36, Tab 5).

In *Mahesh Kumar v. Vidhya Vati*, an individual who sustained a fracture of the right humerus bone with injuries to the knee and back for which he was hospitalized for 12 days and "could not work for a long time" received Rs. 25,000 ($625). (1997) 1070 (Madhya Pradesh) (Def.'s Ex. 36, Tab 5).

In *Ramu Kallappa Kiwada v. U. Rama-das Naik*, a 32 year old who had an amputation of his left leg with fractures of the collar bone right leg which left him crippled, disfigured and permanently disabled, was awarded Rs. 145,000 ($3,625) which included medical expenses and loss of earnings. (1997) 1212 (Karnataka) (Def.'s Ex. 36, Tab 5).

In *Delhi Transport Corp. v. Arun Son-dhi*, a 21 year old university student had his left leg amputated below the knee and suffered severe fractures of the spine which resulted in paralysis from his hip down. (1997) 1286 (Delhi) (Def.'s Ex. 36, Tab 5). He is totally and permanently disabled and will require assistance in everyday living. He was awarded Rs. 868,-781 ($21,719) which included medical expenses plus loss of wages.

In *Karnataka State Road Transp. Corp. v. R. Sethuram*, a 33 year old sustained injuries to his head, arm, right leg and thigh. (1997) 1022 (Karnataka H.C.) (Def.'s Ex. 36, Tab 6). He was in a coma for six weeks, was hospitalized in India for four months, received at least four operations in the United States where he was working at the time of his injury, and is permanently and totally disabled. The Court explained that the "injured became crippled for life as his right hand always remains in a clawed position and he cannot walk without the aid of stick." *Id.* He was awarded Rs. 200,000 ($5,000) for pain and suffering.

Based on these and similar cases, and considering the testimony of the expert witness, a fair reading of the Indian jurisprudence compels the conclusion that an award of between Rs. 2,000,000 ($50,000) and Rs. 4,000,000 ($100,000) would represent the range of damages allowed under the law of India for pain and suffering for the type of injuries sustained by Karim.

Bangladeshi courts recognize, as do our courts, that there is no fixed amount for general damages applicable to all cases. Each case is dependent on its own unique facts and circumstances. Prior cases from Bangladesh, India and the United King-

dom are not determinative, but they are instructive because the objective of this Court is to determine fair compensation for general damages under Bangladeshi law. Taking into consideration the prior jurisprudence as well as the testimony of the experts, and factoring in the unique facts and circumstances surrounding the nature and extent of Karim's injuries and disabilities, this Court finds that a fair compensation under Bangladeshi law for Karim's pain and suffering, past, present and future, is Taka 8,000,000 ($160,000).

## 4. NOMINAL DAMAGES

Bangladeshi law further provides for the recovery of nominal damages. *See Chowdhury, supra,* at 171. A nominal damage award is a trivial sum awarded not by way of compensation for any actual loss suffered, but merely as a means of recognizing the existence of some legal right vested in a plaintiff and violated by the defendant. *See id.* Nominal damages are usually applicable when there have been no other damages. Because Karim is entitled to actual damages, an award of nominal damages is not appropriate in this case.

## 5. AGGRAVATED AND PUNITIVE DAMAGES

Bangladeshi law also allows recovery for aggravated and punitive damages. *See id.* at 167. Aggravated damages differ from punitive damages in that the plaintiff's loss must be increased by the defendant's conduct for aggravated damages to apply. Moreover, aggravated damages are not usually applicable in personal injury cases because the general damage award compensates for all damages, and thus an award of aggravated damages in tort cases would allow double recovery. *See A.B. v. South West Water Services, Ltd.* (1993) 507 Q.B. (Def.'s Ex. 48, Tab 5). In any event, aggravated and punitive damages are only applicable when there is malevolence, spite, intentional or wanton disregard.

*See Basu, supra,* at 64; *Rao,* supra, at 19–20.

The facts of the present case do not support an award of either aggravated or punitive damages. Finch is clearly negligent in this case, but its negligence does not rise to the level required for aggravated or punitive damages. The condition which caused Karim's injury was transitory in nature and without the direct privity and knowledge of the vessel owner. The captain directed the vessel to the nearest, safest, and best medically equipped port considering the fact there was a hurricane in the Gulf that excluded geographically closer ports. The ship's medical chest was inadequately equipped, but not because of intentional, willful or grossly negligent conduct by Finch. Thus, neither aggravated nor punitive damages are appropriate.

In addition, Karim argues that he is entitled to penalty wages under Bangladesh law. Under the Bangladesh Merchant Shipping Ordinance ("MSO") of 1983, a law that defines the rights of merchant seaman, Karim is entitled to wages and provisions for the work he performs. *See* The Bangladesh Merchant Shipping Ordinance § 151 (1983) (Bangl.) (Pl.'s Ex. 34). Karim claims that Finch owes him a debt for wages and argues that failure to pay the debt renders it liable for penalties under the MSO.

Finch does not owe Karim penalty wages because the MSO does not apply to Karim's service aboard the M/V LOUSSIO. The MSO only applies to:

(a) all Bangladesh ships wherever they may be, except inland ships as defined by the Inland Shipping Ordinance, 1976 (LXXII of 1976); (b) all ships deemed to be registered under this Ordinance wherever they may be; (c) all ships, not being Bangladesh ships, licensed under this Ordinance in coasting trade, while engaged in such trade; and (d) all other ships while in a port or place in, or within the territorial waters of Bangladesh.

§ 1(4). The M/V LOUSSIO does not satisfy any of the categories necessary to apply the MSO because it is a foreign vessel neither registered nor serving in Bangladesh. *See* Def.'s Ex. 46 at 6. Because Karim was injured upon a foreign vessel outside of Bangladesh, the requirements of the MSO, including the penalty wage provision, do not apply to him.

Even if the MSO were to apply, Karim is not entitled to penalty wages because there is no debt for wages upon which to base a claim for penalty wages. Karim contends that he is owed penalty wages because he was not paid wages afforded to him by section 153(1)(b) of the MSO.[10] Section 153 explains that a seaman whose service terminates before the date agreed to in his contract "by reason of ... his unfitness or inability to proceed on the voyage, ... shall be entitled to receive ... wages for the period from the date his service is terminated until he is returned to and arrives at a proper return port subject to such limits as may be prescribed." MSO § 153. Pursuant to section 153(1)(b), Karim argues that he is entitled to wages from the time he left the service of the M/V LOUSSIO until the time he was returned to Chittagong, Bangladesh.

Karim's argument for penalty wages misses the mark because he mistakenly

10. Karim also contends that he is owed penalty wages for Finch's failure to pay him contractual wages according to Article 11 of the Shipping Articles. *See* Def.'s Ex. 1 at 7. That provision provides for a subsistence allowance "to a seaman on return to his port of engagement on completion of a period of service." *Id.* These wages, however, are not earned wages contemplated by section 146. Karim could not be owed the wages cited by Karim from the Shipping Articles once he returned to Bangladesh because he already had initiated litigation and avoided any contact with Finch. Finch also was out of business at this time and could not execute the contract. Therefore, Finch did not and could not owe wages under the Shipping Articles that may be subject to the penalty wage provision of the MSO.

assumes Finch owes him any wages. First, Finch owes Karim no earned wages because the evidence indicates that he received payment for his work aboard the M/V LOUSSIO when he terminated his service aboard the vessel in New Orleans. *See* Def.'s Ex. 1. Karim confirmed his termination and receipt of past earned wages by signing the Shipping Articles. *See id.* Although Karim contends he did not understand what he was signing because he does not read English, his signature simply acknowledges his receipt of wages. Therefore, Karim has no debt for earned wages upon which he may base a claim for penalty wages.

Second, Finch does not owe Karim penalty wages because it owes him no statutory wages provided by section 153(b)(1). Karim affirmatively chose to remain in the United States for almost two years despite Finch's efforts to repatriate him according to section 136 of the MSO.[11] A Bangladeshi court would not apply section 153(b)(1) to award wages to a Bangladeshi seaman who actively prevented his repatriation. *See* Def.'s Ex. 46 at 8. An award of section 153(b)(1) wages for Karim's decision not to return to Bangladesh would result in an unjust enrichment. Moreover, section 153(1)(b) explains that wages are to be awarded "subject to such limits as may be prescribed." MSO § 153(1)(b). Bangladeshi law prescribes limits to an award of wages under 153(b)(1) if a seaman refused repatriation, regardless of whether the seaman had good reason for not returning to his home port. *See* Def.'s Ex. 46 at 8. Thus, Karim is not entitled to penalty wages because he chose to remain in the United States and not to return to Bangladesh.

## C. PREJUDGMENT INTEREST

■ In addition, Bangladesh law allows the court to award, at its discretion, pre-judgment interest at a rate that the court considers reasonable. *See* Bangl. Code Civ. P., Art. 34 (Pl.'s Ex. 35). This principle is consistent with the general maritime law of the United States which also allows for prejudgment interest on past damages, with the starting date left to the discretion of the judge. *See Marathon Pipe Line Co. v. M/V Sea Level II,* 806 F.2d 585 (5th Cir.1986); *Doucet v. Wheless Drilling Co.,* 467 F.2d 336 (5th Cir.1972).

Finch originally filed its petition for limitation of liability on April 3, 1996. The proceeding, however, was stayed at the request of Karim on October 16, 1996 so that he could pursue his claims in state court. The action before this Court was not reactivated until November 25, 1998 after the state courts dismissed Karim's claims for lack of personal jurisdiction. Thus, prejudgment interest on past damages should commence at the rate of 5.67% per annum from November 25, 1998.

## D. LITIGATION COSTS

Finally, the law of Bangladesh allows the Court to assess litigation costs, including attorney's fees. *See* Bangl. Code Civ. P., Art. 35 (Pl.'s Ex. 35). The amount is discretionary with the Court and is dependent, in large part, upon the effort and result. *See* Pl.'s Ex. 37, ¶ 6. Contingency fees are disfavored in Bangladesh, and an award of attorneys fees should be based upon the work of the counselor. *See id;* Def.'s Ex. 46 at 5–6. Taking these factors into consideration, the Court concludes that an award for the Plaintiff's litigation costs including attorney's fees is appropriate and that these costs are to be borne by the defendant in the amount of Taka 3,500,000 ($70,000).

---

11. Section 136 provides:
 When the service of a seaman or apprentice terminates, without the consent of the seaman or apprentice, at a port or place outside Bangladesh, and before expiration of the period for which the seaman was engaged ..., the master or owner of the ship shall, in addition to adequate provision for the maintenance of the seaman ... and for the return of that seaman or apprentice to a proper return port.
 MSO § 136.

## IV. CONCLUSION

For the foregoing reasons, the Court finds that the plaintiff Fazal Karim sustained damages because of the defendant Finch's negligence and the unseaworthiness of the M/V LOUSSIO. Nevertheless, the Court finds that Finch had neither privity nor knowledge of the unseaworthy condition of the M/V LOUSSIO and accordingly grants Finch's petition to limit its liability.

Karim is entitled to recover from Finch the following damages: Taka 654,064 ($13,081.28) for past earnings lost; Taka 1,322,585 ($26,451.70) for future earnings lost; Taka 3,183,408 ($63,668.16) for outstanding medical expenses; Taka 1,000,000 ($20,000) for future medical expenses; Taka 8,000,000 ($160,000) for general damages (Taka 5,000,000 ($100,000) attributed to past general damages and Taka 3,000,000 ($60,000) for future general damages); and, Taka 3,500,000 ($70,000) for litigation costs including attorneys fees.

Additionally, Karim is entitled to pre-judgment interest on the above past losses totaling Taka 8,837,472 ($176,749.44) at the rate of 5.6% per annum from November 25, 1998 until the date of this judgment, and interest at the same rate on all sums from the date of judgment until the judgment is paid.