REVISED OCTOBER 16, 2001

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 00-30683

_____

NOOR BEGUM KARIM, Wife of; FAZAL KARIM

                    Plaintiffs - Appellants - Cross-Appellees

        v.

FINCH SHIPPING COMPANY, LTD.; ET AL

                    Defendants

FINCH SHIPPING COMPANY, LTD.

                    Defendant - Appellee - Cross-Appellant

_____

Appeals from the United States District Court
for the Eastern District of Louisiana
_____

September 5, 2001

Before KING, Chief Judge, BARKSDALE, Circuit Judge, and SCHELL,[*] District Judge.

KING, Chief Judge:

     In this maritime personal injury case, both parties appeal the judgment of the district court.  For the following reasons, we AFFIRM.

_____

     [*]     District Judge of the Eastern District of Texas, sitting by designation.

## I.  FACTUAL BACKGROUND

On January 18, 1995, Plaintiff/Appellant/Cross-Appellee Fazal Karim, a citizen of Bangladesh, was engaged as a seaman aboard the M/V LOUSSIO, a Panamanian-flag bulk carrier owned by Defendant/Appellee/Cross-Appellant Finch Shipping Company, Ltd. ("Finch"), a Maltese corporation.  While at sea off the coast of Bermuda, on August 17, 1995, Karim was seriously and permanently injured when he slipped and fell some twenty to thirty feet to the bottom of a cargo hold.[1]  He endured severe injuries from his fall: he fractured his lumbar vertebrae; he fractured, on his left side, his hip, pelvis, leg, ankle, heel, and wrist; he incurred several herniated discs in his back and neck; and he suffered a detached retina in his right eye.

During Karim's evacuation out of the hold, he experienced acute pain.  Once in the vessel's infirmary, Karim was administered aspirin and non-narcotic medication because other pain medications, including codeine and morphine, had expired. Karim was unable to move and unable to use the bathroom independently.  He remained in this condition for nine days.

Captain Mohammed Yosuf contacted the international medical service, C.I.R.M. Medical Italia, by telex for assistance. Although Captain Yosuf was advised by doctors in Rome to evacuate

---

[1]     The district court sets forth the details of Karim's fall in its opinion.  See Karim v. Finch Shipping Co., 94 F. Supp. 2d 727, 731-32 (E.D. La. 2000).

Karim, Captain Yosuf could not do so because he was unable to obtain helicopter service from Bermuda due to an impending tropical storm. Captain Yosuf chose to proceed past the Bahamas and Florida. Following discussions with the Coast Guard and C.I.R.M. doctors, he directed the vessel to New Orleans. During this nine-day voyage, Karim was in excruciating pain, an ordeal that the district court described as "a window into Hell." Karim v. Finch Shipping Co. ("Karim I"), 94 F. Supp. 2d 727, 732 (E.D. La. 2000). Upon arrival in New Orleans, Karim was evacuated by helicopter to Jo Ellen Smith Hospital in Algiers, Louisiana, where he received extensive medical treatment, including various surgeries.

## II.  PROCEDURAL HISTORY

On November 30, 1995, Karim and his wife, Noor Begum Karim, brought suit against Finch and six other parties in the Civil District Court for the Parish of Orleans, State of Louisiana. Then, on December 5, 1995, Karim brought suit in the United States District Court for the Eastern District of Louisiana, seeking to enjoin the Immigration and Naturalization Service ("INS") from deporting him. He sought this injunction because of his debilitated condition and urgent need for medical care. The district court granted Karim's request for a temporary restraining order against the INS. Subsequently, on December 15,

3

the district court issued a preliminary injunction preventing Karim's deportation.

Also on December 15, Karim filed an action in the same federal district court against the M/V LOUSSIO in rem, Finch, and several other parties. Finch posted a security bond for the vessel in district court, and it was released on December 21, 1995. Shortly thereafter, on December 26, 1995, Finch entered an appearance and filed an answer and claim.

In addition, on April 3, 1996, Finch instituted a separate limitation of liability proceeding pursuant to 46 U.S.C. App. § 185[2] in the same district court. The district court then entered a monition[3] and concursus[4] in this limitation action, restraining the prosecution of any state court claims and requiring all parties with claims against Finch to direct those claims to its court. Karim filed an answer, contesting Finch's right to limitation of liability and seeking damages for his injuries under the Jones Act, 46 U.S.C. § 688, and general United States maritime law. On October 16, 1996, after receiving the appropriate stipulations, the district court stayed the limitation action, lifted the monition, and permitted Karim to

---

[2]    See infra note 7.

[3]    See infra note 8.

[4]    See infra text preceding note 8.

4

pursue his claims against Finch in state court, all the while preserving Finch's right to seek limitation in its court.

In April 1997, the district court granted Karim's motion to voluntarily dismiss his claims in Karim's federal action and entered judgment in favor of the defendants, which was subsequently affirmed by this court. See Karim v. Finch Shipping, No. 97-31027, 177 F.3d 978 (5th Cir. 1999) (unpublished table opinion). Thereafter, the actions then pending were Karim's state court suit against Finch, and Finch's federal limitation proceeding.

Also, on April 10, 1997, in another proceeding, the district court dissolved the preliminary injunction preventing Karim's deportation because Karim's medical condition had improved and he was capable of travel. Karim was then returned to Bangladesh.

On July 9, 1997, the state trial court found that it lacked personal jurisdiction over Finch, and the Louisiana Fourth Circuit Court of Appeal affirmed. See Karim v. Finch Shipping Co., 97-2518 (La. App. 4 Cir. 8/26/98), 718 So. 2d 572.[5] The

---

[5] We note that the Louisiana Fourth Circuit Court of Appeal in a subsequent case held that it should not have considered the issue on the merits in Karim. See Jackson v. America's Favorite Chicken Co., 98-0605 (La. App. 4 Cir. 2/3/99), 729 So. 2d 1060, 1065 (stating that an appeal from a partial summary judgment that lacks requisite designation by the trial court or an agreement of the parties to that effect may not be converted to a supervisory writ and then considered on the merits and overruling the procedure in Karim).

5

Louisiana Supreme Court denied review. See Karim v. Finch Shipping Co., 98-2499 (La. 11/25/98), 729 So. 2d 568.

On June 30, 1998, Finch moved to dismiss voluntarily its federal limitation action, but the district court denied the motion because the issues regarding claims against the res and limitation of liability had been joined. On May 17, 1999, Finch moved to dismiss its claim for lack of personal jurisdiction, res judicata, and forum non conveniens. Alternatively, Finch moved for summary judgment on Karim's penalty wage claim brought pursuant to 46 U.S.C. § 10313. The district court denied Finch's motion to dismiss, but granted summary judgment in favor of Finch on the penalty wage claim and dismissed Karim's wife's claims for lack of evidence.

The district court conducted a trial on Finch's limitation petition on January 24 and 25, 2000. Additional testimony regarding the law of Bangladesh was heard on March 20, 2000. On April 14, 2000, the district court entered its detailed Findings of Fact and Conclusions of Law in which it made the following rulings: (1) the district court properly had jurisdiction in the matter; (2) Finch was entitled to limitation, but not exoneration, of liability; (3) the choice-of-law analysis pointed to Bangladeshi law; (4) the case was not appropriate for a forum non conveniens dismissal; (5) Karim was entitled to $63,668.16 for past medical expenses, $20,000 for future medical expenses, $13,081.28 for past lost wages, $26,451.70 for lost future wages,

6

and $160,000 for general damages (pain and suffering); (6) Karim was not entitled to nominal, aggravated, or punitive damages; (7) Karim was entitled to prejudgment interest on past losses (totaling $176,749.44) at a rate of 5.6% per annum from the date the limitation action was reactivated in federal court (November 25, 1998) until the date of the district court judgment (April 14, 2000); and (8) Karim was entitled to $70,000 for litigation costs, including attorneys' fees.  See Karim I, 94 F. Supp. 2d at 746.  The district court denied Karim's post-trial motions, see Karim v. Finch Shipping Co. ("Karim II"), 111 F. Supp. 2d 783, 784-85 (E.D. La. 2000), and Karim timely appealed.  Finch also timely cross-appealed.

### III. PROPRIETY OF THE DISTRICT COURT'S JUDGMENT

As both Karim and Finch are cross-appealing almost all aspects of the district court's ruling, we analyze at the outset those issues presenting threshold matters, which may pretermit the determination of other points on appeal.  Therefore, we address the following issues in turn:  (1) whether the district court properly determined that it had jurisdiction; (2) whether the district court erred in refusing to dismiss the action on forum non conveniens grounds; (3) whether the district court erred in determining a "quantum" for general damages under Bangladeshi law; (4) whether the district court's general damage

7

award was excessive under Bangladeshi law; (5) whether the district court erred by failing to apply the codified general maritime law of Bangladesh — the Merchant Shipping Ordinance (the "MSO"); (6) whether the district court erred in granting summary judgment on the United States penalty wage statute; (7) whether the district court erred in failing to award maintenance under the employment contract, the MSO, or the United States general maritime law; (8) whether the district court erred in its determination of prejudgment interest; and (9) whether the district court erred in its determinations of litigation costs, including attorneys' fees.

## A. Jurisdiction

We provide first a brief background on limitation of liability actions.  Then, we analyze Finch's jurisdictional challenge.

### 1. Statutory Background

This case concerns the Limitation of Liability Act of 1851, 46 U.S.C. App. §§ 181-196 (amended 1936) (the "Act").  "The Act was primarily patterned after the English limitation act, 26 Geo. 3, ch. 86 (1786)." Vatican Shrimp Co. v. Solis, 820 F.2d 674, 677 (5th Cir. 1987); see also Just v. Chambers, 312 U.S. 383, 385 (1941) (stating that the limitation of liability statutory provisions were "enacted in light of the maritime law of modern

Europe and of legislation in England").  The Supreme Court has

described the purpose of the Act, stating:

> [T]he great object of the [Act] was to encourage
> shipbuilding and to induce the investment of money in
> this branch of industry[] by limiting the venture of
> those who build the ship to the loss of the ship itself
> or her freight then pending, in cases of damage or
> wrong, happening without the privity or knowledge of
> the ship owner, and by the fault or neglect of the
> master or other persons on board.

Hartford Accident & Indem. Co. v. S. Pac. Co., 273 U.S. 207, 214

(1927).

The Act provides shipowners two alternative legal channels

to initiate their limitation of liability rights.  Under 46

U.S.C. App. § 183,[6] a shipowner can "set up [limitation] as a

defense" by pleading the general substantive provisions of § 183

in an answer filed in any court, including a state court.  See

Langnes v. Green, 282 U.S. 531, 543 (1931).  However, when the

---

[6]    46 U.S.C. App. § 183 states in relevant part:

(a) Privity or knowledge of owner; limitation

The liability of the owner of any vessel, whether
American or foreign, for any embezzlement, loss, or
destruction by any person of any property, goods, or
merchandise shipped or put on board of such vessel, or
for any loss, damage, or injury by collision, or for
any act, matter, or thing, loss, damage, or forfeiture,
done, occasioned, or incurred, without the privity or
knowledge of such owner or owners, shall not, except in
the cases provided for in subsection (b) of this
section, exceed the amount or value of the interest of
such owner in such vessel, and her freight then
pending.

46 U.S.C. App. § 183 (Supp. 2001).

"right of [the shipowner] to a limited liability [is] brought into question . . . [it brings the action] within the exclusive power of a court of admiralty."  Id. at 542.

The shipowner's second option is to file a limitation petition in federal district court under 46 U.S.C. App. § 185.[7] The 1936 Amendments to the Act added the requirement that the shipowner must file such a petition "within six months after a claimant shall have given to or filed with such owner written notice of claim."  46 U.S.C. App. § 185.  This six-month time limit is not found in § 183.  If the shipowner chooses to file a § 185 petition, the shipowner also must post a bond "equal to the

---

[7]     46 U.S.C. App. § 185 provides:

The vessel owner, within six months after a claimant shall have given to or filed with such owner written notice of claim, may petition a district court of the United States of competent jurisdiction for limitation of liability within the provisions of this chapter and the owner (a) shall deposit with the court, for the benefit of claimants, a sum equal to the amount or value of the interest of such owner in the vessel and freight, or approved security therefor, and in addition such sums, or approved security therefor, as the court may from time to time fix as necessary to carry out the provisions of section 183 of this title, or (b) at his option shall transfer, for the benefit of claimants, to a trustee to be appointed by the court his interest in the vessel and freight, together with such sums, or approved security therefor, as the court may from time to time fix as necessary to carry out the provisions of section 183 of this title.  Upon compliance with the requirements of this section all claims and proceedings against the owner with respect to the matter in question shall cease.

46 U.S.C. App. § 185 (1958).

10

amount or value of the interest of such owner in the vessel and freight" with the district court.  See id.

The procedure provided for in § 185 is known as a "concursus," and the purpose behind such a proceeding in federal court is to permit all actions against the shipowner to be consolidated into a single case so that all claims may be disposed of simultaneously:  "When a shipowner files a federal limitation action, the limitation court stays all related claims against the shipowner pending in any forum, and requires all claimants to timely assert their claims in the limitation court."[8] Magnolia Marine Transp. Co. v. Laplace Towing Corp., 964 F.2d 1571, 1575 (5th Cir. 1992).  "The court takes jurisdiction to entertain those claims without a jury and ensures that the shipowner who is entitled to limitation is not held to liability in excess of the amount ultimately fixed in the limitation suit (the limitation fund)."  Id. (internal citations omitted).  As the Supreme Court explained:

> [In essence, the § 185 proceeding] is the administration of equity in an admiralty court. . . . [The proceeding] looks to a complete and just disposition of a many cornered controversy, and is applicable to proceedings in rem against the ship as well as to proceedings in personam against the owner, the limitation extending to the owner's property as well as to his person.

---

[8]    The admiralty court's order in this regard is commonly referred to as a "monition."

11

Hartford, 273 U.S. at 216 (emphasis and internal citations omitted).

### 2. Jurisdictional Analysis

"We review jurisdictional determinations de novo."  Hidden Oaks Ltd. v. City of Austin, 138 F.3d 1036, 1041 (5th Cir. 1998); see also Groome Res. Ltd., L.L.C. v. Parish of Jefferson, 234 F.3d 192, 198 (5th Cir. 2000) ("Jurisdiction is a question of law which we review de novo.").

The Supreme Court has clearly stated:  "The jurisdiction of the admiralty court attaches in rem and in personam by reason of the custody of the res put by the petitioner into its hands." Hartford, 273 U.S. at 217 (emphasis omitted).  "The court of admiralty, in working out its jurisdiction, acquires the right to marshal all claims, whether of strictly admiralty origin or not, and to give effect to them by the apportionment of the res and by judgment in personam against the owners, so far as the court may decree."  Id. (emphasis omitted); see also Just, 312 U.S. at 386 (stating that a court of admiralty in a limitation proceeding "may furnish a complete remedy for the satisfaction of [all] claims by distribution of the res and by judgments in personam for deficiencies against the owner, if he is not released by virtue of that statute" (emphasis omitted))[9]; The Chickie, 141

_____

[9]    We note that Shaffer v. Heitner, 433 U.S. 186 (1977), does not cast doubt upon the statements in Hartford and Just that the admiralty court also has "in personam" jurisdiction via the res.  In Shaffer, the Supreme Court held that the requirements

12

F.2d 80, 84 (3d Cir. 1944). The Supreme Court has also stated that the admiralty court retains its jurisdiction regardless of how the limitation issue is resolved. See Just, 312 U.S. at 386-87; Hartford, 273 U.S. at 220.

As these statements by the Supreme Court indicate, we do not confront this issue res nova. Although Finch repeatedly asserts that it is a novel question whether a shipowner "waives" its jurisdictional defenses by filing a "defensive" limitation of liability petition, as explained above and further discussed below, Finch's characterization of the question is inaccurate, and the question itself is not novel.

Finch's argument rests on its assertion that it had a right under federal law to invoke a concursus and a statutory right to seek limitation of liability in federal court. Finch claims that it was "compelled" to file a petition under 46 U.S.C. App. § 185

---

for "quasi in rem" and "in personam" jurisdiction are identical – i.e., the standard set forth in International Shoe Co. v. Washington, 326 U.S. 310 (1945), and its progeny. See Shaffer, 433 U.S. at 212. Quasi in rem jurisdiction refers to a court obtaining in personam jurisdiction via property located in the jurisdiction.

In cases such as the present one, the limitation petitioner voluntarily and personally places the res in the hands of the court. This situation is unlike the scenario in Shaffer in which the property located in the jurisdiction was unrelated to the lawsuit and was not placed in the hands of the court by the party itself. Moreover, in Burnham v. Superior Court of California, 495 U.S. 604 (1990), the Supreme Court declined to extend Shaffer and admonished the petitioner for "wrenching" its statements in Shaffer out of context. See id. at 619-21.

We also note that, in the case before us, a judgment in excess of the res is not at issue.

13

within the provision's six-month time limitation; otherwise, it would have forfeited its access to limitation of liability. Finch argues that its limitation action was therefore "defensive" in nature and filed only in response to Karim's state court action, which sought damages in excess of the value of the vessel. In essence, Finch is claiming that, under the district court's ruling, shipowners face a Hobson's choice — i.e., forego their in personam jurisdiction defense, guaranteed by the Due Process clause, or risk the possible loss of their right to seek limitation of liability.

We do not agree. Finch is not facing a so-called "Hobson's choice." Rather, Finch is simply attempting to invoke the protections of a federal court without fulfilling its concomitant responsibility as a result of that invocation. If a shipowner wishes to contest the jurisdiction of a United States court, it has every right to do so. However, if the shipowner wishes to avail itself of the benefits offered by this forum (here, a limitation of liability action), then it cannot complain that the court had no power over it.[10] By invoking the statutory

---

[10] This is so even with our decision in Vatican Shrimp Co. v. Solis, 820 F.2d 674 (5th Cir. 1987). Vatican Shrimp held that a "defensive pleading in the state court answer [does] not provide the federal court with jurisdiction to hear the shipowner's limitation claim." Id. at 677. The consequence of this holding is that a shipowner cannot always rely upon raising limitation in a state court answer because, once the limitation is contested, it falls within the exclusive jurisdiction of a federal admiralty court. As such, if a shipowner has not filed its § 185 petition within the six-month time frame, it forfeits

14

opportunity to limit its liability, the shipowner consents to the jurisdiction of the court. As the district court succinctly stated: Finch voluntarily provided the district court in rem jurisdiction by commencing the limitation petition and placing the res, or the bond, in the hands of the court, and Finch invoked the powers of the court to require Karim to halt his proceeding in another forum and to file in the limitation action.[11] Finch cannot now be permitted "to abandon its limitation proceeding without prejudice and quietly float away." Karim I, 94 F. Supp. 2d at 734.

Moreover, Finch's argument that the district court did not retain jurisdiction because Karim chose to proceed in state court, which subsequently dismissed his claims for lack of jurisdiction, "misses the mark." Id.

_____

that defense. In order to ensure access to limitation of liability, shipowners must therefore file § 185 petitions in federal court to account for the possibility that the petitions may be contested. Finch asserts that, because of Vatican Shrimp, it is essentially required to file a § 185 petition.

However, as stated in the text, Finch is not "required" to take advantage of defenses offered under federal statutes; its action is voluntary in that it made a strategic choice to avail itself of a United States statutory defense to limit its liability. Once again, if Finch wishes to take advantage of a benefit offered by United States laws, it cannot be heard to complain (after the need for the defense may have evaporated) that the very United States court it voluntarily petitioned and utilized had no power over it.

[11] As recently as December 1998, Finch invoked the protections of the district court. The district court denied additional claims by Karim in federal court because of the monition and concursus entered by the district court on Finch's behalf.

15

> Karim's claims in state court were in personam claims. The state court did not consider the merits of the claims and only held that it had no in personam jurisdiction. The limitation proceeding in [the district court], however, is an in rem proceeding. . . . The fact that a state court . . . lacks in personam jurisdiction does not deprive [the district court] of its in rem jurisdiction.

Id. (emphasis omitted). We agree with the district court, which stated, relying upon Just and Hartford, that it had "a responsibility to provide a complete remedy to satisfy the answers and claims filed in Finch's limitation proceeding pursuant to its requested monition." Id.

Finch also argues that The Bremen v. Zapata Off-Shore Co., 407 U.S. 1 (1972), and World Tanker Carriers Corp. v. M/V YA MAWLAYA, 1996 WL 20874 (E.D. La. Jan. 18, 1996), rev'd, 99 F.3d 717 (5th Cir. 1996), support its position that the filing of a defensive limitation action should not operate to deprive a shipowner of an in personam jurisdiction defense. Again, Finch's arguments are unpersuasive.

In Bremen, the Supreme Court held that a forum selection clause was prima facie valid and that it "should control absent a strong showing that it should be set aside" and remanded the case for a determination whether the clause was unreasonable and unjust or invalid. See 407 U.S. at 15. The clause in Bremen stated that disputes were to be resolved in London, England. The Court stated that the filing of a limitation complaint in a United States federal court did not nullify the prima facie

16

validity of the forum selection clause, focusing on the "defensive" nature of the limitation proceeding.  See id. at 19-20.  Finch thus claims that the result in Bremen "would not have been possible if the filing of a defensive limitation action irrevocably subjects the res to the jurisdiction of the court."

Finch attempts to extend the Bremen holding to argue that a "defensive" limitation proceeding does not definitively submit the shipowner to the jurisdiction of the United States court.  Such an extension is untenable because it conflicts with Hartford and is unsupported because the Bremen Court did not limit Hartford in any fashion.  We note first that the Bremen Court was primarily motivated by its desire to temper the hostility toward forum selection clauses, particularly at a time when international transactions and agreements were beginning to expand.  See Bremen, 407 U.S. at 9, 15 (stating that forum selection clauses "have historically not been favored by American courts" and that "in the light of present-day commercial realities and expanding international trade" such hostility could not be sanctioned).  The Court also emphasized that the "choice of . . . forum was made in an arm's-length negotiation by experienced and sophisticated businessmen."  Id. at 12; see also id. at 17 (stating that the case "involves a freely negotiated international commercial transaction between a German and an American corporation").

17

Furthermore, the Court did <u>not</u> state that the federal district court did not have jurisdiction over the action (or that the parties could now assert an in personam jurisdiction defense); rather, it stated that the district court should not have <u>exercised</u> that jurisdiction: "The threshold question is whether [the district] court should have exercised its jurisdiction to do more than give effect to the legitimate expectations of the parties, manifested in their freely negotiated agreement, by specifically enforcing the forum clause." <u>Id.</u> at 12. So, while the res established federal court jurisdiction, the district court in <u>Bremen</u> should have, in its discretion, chosen not to exercise that jurisdiction.

Finch's reliance on this court's decision in <u>World Tanker</u>, which dealt with Federal Rule of Civil Procedure 4(k)(2), is similarly flawed. "Rule 4(k)(2) . . . sanctions personal jurisdiction over foreign defendants for claims arising under federal law when the defendant has sufficient contacts with the nation as a whole to justify the imposition of United States' [sic] law but without sufficient contacts to satisfy the due process concerns of the long-arm statute of any particular state." <u>World Tanker Carriers Corp. v. MV YA MAWLAYA</u>, 99 F.3d 717, 720 (5th Cir. 1996) (emphasis omitted). Reversing the district court, this court held that admiralty cases fell within the ambit of Federal Rule of Civil Procedure 4(k)(2). <u>See id.</u> at 723.

18

Finch states that the <u>World Tanker</u> district court rejected the argument that a shipowner had submitted to the jurisdiction of the federal court by filing its limitation action and by submitting a letter of undertaking.  Finch argues further that, on appeal, this court did not disturb the district court's holding that the filing of the limitation was a solely defensive measure that did not subject the shipowner to the jurisdiction of the court, but that this court reversed and remanded for a consideration of the shipowner's national contacts pursuant to Rule 4(k)(2).  Finch asserts that this remand would have been unnecessary if this court had concluded that the voluntary filing of a defensive limitation action subjects the shipowner to either in rem or in personam jurisdiction.

First, we note that the reversed district court in <u>World Tanker</u> appears to cite incorrectly to <u>Bremen</u>.  As discussed <u>supra</u> in this section, <u>Bremen</u> did not state that a limitation action was insufficient to confer jurisdiction, but only that in some cases (such as those involving a valid forum selection clause), courts should employ their discretion not to exercise their jurisdiction.  Moreover, the <u>World Tanker</u> district court did not mention the Supreme Court's <u>Hartford</u> decision.  In reversing and remanding, this court explicitly did not address the jurisdiction issue with regard to the limitation proceeding.  <u>See</u> <u>World</u>

19

Tanker, 99 F.3d at 724.[12]  We will not ignore the explicit dictates of long-established Supreme Court precedent on such a flimsy (if not nonexistent) reed.

In sum, we are faced with a situation in which Finch filed a limitation proceeding and placed the res in the hands of the court, let the proceeding pend for four years, made use of the concursus and monition, utilized the district court for its own interests by, for example, attempting to maintain a multi-claimant action by itself filing claims against other parties and opposing Karim's access to other courts, and then after the vessel was sold (and the company defunct), filed a motion to dismiss the limitation action on the basis of personal jurisdiction and forum non conveniens.[13]  When the instant United

_____

[12]  While the facts as set forth in the World Tanker case do not indicate the precise nature of the limitation action, it is possible that the jurisdiction was not perfected.  The World Tanker district court cited to Panaconti Shipping Co., S.A. v. M/V YPAPANTI, 865 F.2d 705, 708 (5th Cir. 1989), for the proposition that the letter of undertaking was insufficient to trigger in rem jurisdiction.  See World Tanker, 1996 WL 20874, at *1.  However, the statements made by the Panaconti court in this regard dealt with a situation in which no res existed.  See Panaconti, 865 F.2d at 707.  The vessel had not been arrested, and the limitation petitioner had not posted security.  See id. The Panaconti court found that although the court did not have possession of the vessel or its bond, the letter of undertaking sufficiently preserved in rem jurisdiction.  See id. at 708.  In this case, by contrast, a res definitely existed and was placed in the hands of the court by Finch.

[13]  So, in answer to Finch's query, the reason that a Bangladeshi seaman's action against a Maltese ship is in federal court is because the shipping company itself sought the protection and benefits of United States law.

20

States laws cease to be of use, a party cannot extinguish the proceedings.  Shipowners cannot avail themselves of the benefits under United States laws, but then refuse to bear the possible burdens under those laws.

### B. Forum Non Conveniens

"The forum non conveniens determination is committed to the sound discretion of the trial court.  It may be reversed only when there has been a <u>clear abuse of discretion</u>; where the court has considered all relevant public and private interest factors, and where its balancing of these factors is reasonable, its decision deserves substantial deference."  <u>Piper Aircraft Co. v. Reyno</u>, 454 U.S. 235, 257 (1981) (emphasis omitted and added); <u>see also</u> <u>McLennan v. Am. Eurocopter Corp.</u>, 245 F.3d 403, 423 (5th Cir. 2001) ("We review the district court's denial of a motion to dismiss for forum non conveniens for a clear abuse of discretion.").

The "doctrine of forum non conveniens proceed[s] from [the] premise [that] . . . [i]n rare circumstances, federal courts can relinquish their jurisdiction in favor of another forum." <u>Quackenbush v. Allstate Ins. Co.</u>, 517 U.S. 706, 722 (1996) (emphasis omitted).  This doctrine enables a court to decline to exercise its jurisdiction if the moving party establishes that the convenience of the parties and the court and the interests of justice indicate that the case should be tried in another forum. Building upon its previous case in <u>Gulf Oil Corp. v. Gilbert</u>, 330

U.S. 501 (1947), the Supreme Court set out the framework for analyzing forum non conveniens in an international context in Piper Aircraft. First, "the court must determine whether there exists an alternative forum." Piper Aircraft, 454 U.S. at 254 n.22. Second, the court must determine which forum is best suited to the litigation. See id. at 255.

The following factors are generally considered in the first step: (1) amenability of the defendant to service of process and (2) availability of an adequate remedy in the alternative forum. See id. at 254-55 n.22; see also McLennan, 245 F.3d at 424. In performing the second step, a court must consider whether "certain private and public interest factors weigh in favor of dismissal." McLennan, 245 F.3d at 424.[14]

---

[14] The "private interest" factors include:

> the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of [the] premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive[;] . . . enforceability of judgment . . . [; and whether] the plaintiff [has sought to] "vex," "harass," or "oppress" the defendant.

Gulf Oil, 330 U.S. at 508.
    The "public interest" factors include administrative difficulties, reasonableness of imposing jury duty on the people of the community, holding the trial in the view of those affected, and local interest in having localized controversies decided at home. See id. at 508-09.

22

The district court concluded that, although Finch had made a timely motion to dismiss for forum non conveniens, the court could not consider the motion until the limitation issue (which depended upon United States law) had been decided.  See Karim I, 94 F. Supp. 2d at 736-37.  After resolving the limitation question, the district court performed the familiar Gulf Oil/Piper Aircraft forum non conveniens analysis and determined that the private and public interest factors demonstrated that no other forum was adequate, available, or more convenient than the current one.

Finch claims that the district court erred in refusing to dismiss the action on forum non conveniens grounds primarily because it delayed consideration of the motion until the resolution of the limitation issue.  By doing so, Finch asserts that the district court permitted the creation of the very factors upon which it later relied to find that another forum was not appropriate.

We note at the outset that the district court was perhaps generous in characterizing Finch's forum non conveniens motion as "timely."  To be clear, Finch filed its first such motion in response to Karim's federal civil suit (which was eventually dismissed without prejudice).  The district court deferred ruling on the motion to allow Karim to conduct discovery on the matter.  A few months after this first forum non conveniens motion, Finch then instituted its limitation proceeding (the one before us on

23

appeal). Although Finch stated in its limitation petition that it was reserving a forum non conveniens defense, it did not file a motion to dismiss based on those grounds until approximately three years later, on May 17, 1999. Finch claims that this delay was attributable to Karim's efforts to litigate in state court. However, even assuming arguendo that the state litigation interfered with Finch's motion, Finch does not explain why it did not urge the forum non conveniens motion in the time period between its filing of the limitation petition (April 3, 1996) and the district court's authorization for Karim to litigate in state court (October 16, 1996).

In any case, the district court's ultimate refusal to dismiss on forum non conveniens grounds was not a clear abuse of discretion. Although the district court may have given the impression in some of its statements that courts are always obligated to resolve the limitation action before the forum non conveniens issue, the court's ultimate resolution of the forum non conveniens issue is unaltered, as we explain below.

When limitation of liability proceedings and forum non conveniens intersect, the limitation issue is simply taken as yet another factor to consider in the well-established Gulf Oil/Piper Aircraft framework. First, this approach fits within the traditional forum non conveniens test — i.e., Gulf Oil made clear that the factors to be considered in the analysis were not exclusive to the ones it set out. See Gulf Oil, 330 U.S. at 508;

24

see also Piper Aircraft, 454 U.S. at 249-50. And second, this approach also harmonizes with the few reported decisions facing a forum non conveniens issue in the context of a limitation proceeding — i.e., some courts have dismissed the limitation action based on forum non conveniens and some have not, depending on the circumstances involved. See, e.g., Argonaut P'ship, L.P. v. Bankers Tr. Co., Nos. 96 CIV. 1970 (MBM), 96 CIV. 2222 (MBM), available at 1997 WL 45521, at *15 (S.D.N.Y. Feb. 4, 1997) (denying the motion to dismiss on the basis of forum non conveniens and citing, among others, In re Maritima Aragua, S.A., 823 F. Supp. 143 (S.D.N.Y. 1993), which involved various claims in the context of a limitation proceeding); In re Am. President Lines, Ltd., 890 F. Supp. 308, 318 (S.D.N.Y. 1995) (denying the motion to dismiss on the basis of forum non conveniens); In re Maritima Aragua, S.A., 823 F. Supp. 143, 150-51 (S.D.N.Y. 1993) (same). But see In re Geophysical Serv., Inc., 590 F. Supp. 1346, 1361 (S.D. Tex. 1984) (dismissing the action on forum non conveniens grounds).

As for the "limitation proceeding" factor in the forum non conveniens inquiry, we agree with the district court that United States law governed the limitation action. United States courts "must apply foreign limitation law if the substantive liability of the parties is governed by a foreign law and if the limitation law of the foreign country is such an integral part of the substantive law governing the action that it can be said to

25

'attach' to the substantive liability law." Korea Shipping Corp. v. Tokio Marine & Fire Ins. Co., 919 F.2d 601, 604-05 (9th Cir. 1990) (citing Black Diamond S.S. Corp. v. Robert Stewart & Sons, Ltd. (The Norwalk Victory), 336 U.S. 386, 395 (1949)). "If either of the two conditions is not met, then U.S. courts apply the rule in [Oceanic Steam Navigation Co. v. Mellor (The Titanic), 233 U.S. 718 (1914)]: U.S. limitation law controls." Id. at 605.

In this case, Bangladeshi law was found to be the applicable substantive law, a determination that neither party strongly disputes on appeal.[15] However, Finch did not offer any evidence or make any argument that Bangladeshi limitation law even existed, much less that it is so integral that it "attached" to the substantive liability law. Finch did not contest at any point the determination that the "law of the forum" rule, based on Mellor, dictated that United States law applied to its limitation proceeding.[16]

This determination informs the consideration of the forum non conveniens inquiry. In addition to private and public interest factors, such as Karim receiving medical treatment in the United States, evidence and testimony being easily accessible

_____

[15]    See infra note 18.

[16]    In fact, in its briefs, Finch concedes that its case is distinguishable from the Geophysical Services case in that Canadian limitation law was found applicable in the latter case.

26

in this forum, and counsel for both parties being based in this forum, the fact that United States limitation law applies also weighs against dismissal.  See, e.g., Argonaut P'ship, 1997 WL 45521, at *15 (stating that "courts have denied forum non conveniens motions where a related action, requiring much of the same evidence, was pending also in the jurisdiction and could not be dismissed"); Maritima Araqua, 823 F. Supp. at 147 (denying a motion to dismiss on the basis of forum non conveniens and stating that the "crucial factor in the case at bar [was] the presence of the Limitation Proceeding brought by the [shipowners]"); id. at 150-51; see also Am. President Lines, 890 F. Supp. at 318 (holding that the doctrine of forum non conveniens did not compel dismissal of related actions for limitation of vessel owners' liability); Geophysical Serv., 590 F. Supp. at 1357, 1361 (finding the Canadian limitation act applicable and dismissing the action on the basis of forum non conveniens).[17]

As we have recently stated, "[t]he district court's analysis . . . is consistent with the procedural framework [of Gulf Oil/Piper Aircraft that] the district court is obligated to use. Moreover, there is nothing unreasonable about the conclusions reached therein.  Thus, there is no abuse of discretion and no reversible error arising from the district court's denial of

_____

[17]    See supra note 16.

27

. . . [the] motion to dismiss for forum non conveniens."
McLennan, 245 F.3d at 425 (footnote omitted).

### C. Quantum for General Damages Under Bangladeshi Law

As stated above, the district court determined that the substantive law of Bangladesh should apply to Karim's claims.  It then determined the appropriate measure of Karim's damages (i.e., quantum) under Bangladeshi law.  Because of the dearth of reported Bangladeshi cases on quantum in tort, the district court looked to English and Indian precedent for guidance.  The district court found that under Indian jurisprudence, a general damage award for pain and suffering would be approximately in the range of U.S. $50,000 and U.S. $100,000 for Karim's type of injuries.  The court also stated that each case depended on its own unique facts and circumstances and chided Karim for falsely assuming that general damages can be measured without regard to context.  The district court thoroughly analyzed all available information and awarded Karim a total of Taka 8,000,000 (U.S. $160,000).

Karim objects to this determination, arguing that Federal Rule of Civil Procedure 44.1 requires that the party asserting application of foreign law demonstrate the applicability of the foreign law to the court.  Karim states that Finch has not established Bangladeshi law as to quantum, which is evident by

28

the district court's resort to other nations' caselaw.[18]

Describing the policies underlying this requirement, he states

further that, absent sufficient proof of foreign law, the court

shall apply the law of the forum (in this case, that of the

United States).  As such, he faults the district court for

entering into a "contextual analysis" of Indian and English

jurisprudence, which, he claims, is both subjective and

inaccurate.

"We review questions regarding foreign law de novo.  This

analysis is plenary."  Banco de Credito Indus., S.A. v. Tesoreria

Gen., 990 F.2d 827, 832 (5th Cir. 1993) (internal quotations and

citations omitted).  "When the parties have failed to

conclusively establish foreign law, a court is entitled to look

to its own forum's law in order to fill any gaps."  Id. at 836;

see also 9 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND

PROCEDURE § 2447 (1995) (stating that when foreign law cannot be

---

[18]    Federal courts sitting in admiralty apply the admiralty
choice-of-law analysis established in the Supreme Court cases of
Lauritzen v. Larsen, 345 U.S. 571 (1953), and Hellenic Lines,
Ltd. v. Rhoditis, 398 U.S. 306 (1970).  Under the Lauritzen-
Rhoditis framework (as it is commonly called), courts examine the
following nonexhaustive list of factors to determine which
substantive law controls: (1) the place of the wrongful act, (2)
the law of the flag, (3) the allegiance or domicile of the
injured, (4) the allegiance of the defendant shipowner, (5) the
place of contract, (6) the inaccessibility of the foreign forum,
(7) the law of the forum, and (8) the base of operations of the
shipowner.  See Solano v. Gulf King 55, Inc., 212 F.3d 902, 905
(5th Cir. 2000).  While Karim mentions in passing that the above
factors point toward United States law, he focuses his criticisms
on the district court's utilization of English and Indian
precedent in its application of Bangladeshi law.

ascertained, the district court might reconsider its initial decision to apply foreign law and decide instead to apply domestic law (citing, inter alia, Symonette Shipyards, Ltd. v. Clark, 365 F.2d 464, 468 n.5 (5th Cir. 1966))).

Following the trial on the liability and limitation phase of the case, the district court held a trial on the quantum aspect of the matter. There were only two published Bangladeshi tort cases available to the district court, and neither was directly relevant to the quantum issue at hand. The district court also heard testimony and argument from four expert witnesses, and the court found these witnesses to be knowledgeable as to the laws of Bangladesh, India, and the United Kingdom.[19] These experts informed the court that Bangladeshi courts would look to Indian and British cases for guidance.[20]

Thus, Finch marshaled as much information as possible to illuminate what a Bangladeshi court might do under these circumstances. This case is distinguishable from, for example,

---

[19]    The district court's description of the historical origins of Bangladesh concisely and adeptly explains why Bangladeshi legal traditions draw from the jurisprudence of India, Pakistan, and the United Kingdom. See Karim I, 94 F. Supp. 2d at 738.

[20]    Karim argues that while Bangladeshi legal experts confirmed that a Bangladeshi court would look to English precedent to determine the "principles" of various causes of action (such as tort liability), there was no support for the conclusion that such reference would be made in matters of "quantum." We do not agree. The record does contain information that Bangladeshi courts would look to these nations' cases for principles or elements of quantum.

30

Banque Libanaise Pour Le Commerce v. Khreich, 915 F.2d 1000, 1006-07 (5th Cir. 1990), in which the party championing Abu Dhabi law did not call any expert witnesses and only provided the court with a copy of a statute and general materials. Finch met its obligations, and the district court had sufficient information upon which to make its quantum determination. Therefore, the district court did not err in making a determination of quantum under Bangladeshi law by applying English and Indian precedent.

### D. General Damages

As noted above, the district court awarded Karim $160,000 in general damages. Finch contests this determination, asserting that the award was excessive under Bangladeshi law. Finch argues that the district court's award is akin to awarding an American plaintiff in excess of $9 million. Finch asserts further that its expert opined, based on Indian cases, that a Bangladeshi court would award damages in the range of Taka 250,000 (U.S. $5,000).

Karim responds that Finch's analysis ignores its own expert's testimony regarding British cases and focuses only on Indian caselaw. He also points out that the only reported Bangladeshi case regarding personal injury did not refer to Indian cases, but to British precedent. In essence, this is Karim's argument in the alternative — i.e., that if we find that quantum was appropriately determinable under Bangladeshi law and

not excessively low, Karim argues that the amount is not excessively high.

Based on the information in the record and in the district court's thorough opinion, we conclude that the court did not err in setting the amount of general damages under Bangladeshi law to be U.S. $160,000.[21]  See Karim I, 94 F. Supp. 2d at 740-43.

### E. Application of the Merchant Shipping Ordinance

The district court found that the MSO (the codified general maritime law of Bangladesh) did not apply to Karim's service aboard the vessel because MSO § 1(4) states that the MSO only applies to (1) Bangladeshi ships, (2) ships registered under the MSO, (3) ships licensed under the MSO in coasting trade while engaged in such trade, and (4) all other ships while in port or within the territorial waters of Bangladesh.[22]  See Karim I, 94 F. Supp. 2d at 744.  Thus, because it had determined that the MSO was inapplicable in this case, the district court held that the

---

[21]     We note that Finch's so-called numerical comparisons as to the value of the award in Bangladesh are not persuasive.  Such homemade statistics are suspect.

[22]     Section 1(4) of the MSO reads more completely as follows:

(a) all Bangladesh ships wherever they may be, except inland ships as defined by the Inland Shipping Ordinance, 1976 (LXXII of 1976); (b) all ships deemed to be registered under this Ordinance wherever they may be; (c) all ships, not being Bangladesh ships, licensed under this Ordinance in coasting trade, while engaged in such trade; and (d) all other ships while in a port or place in, or within the territorial waters of Bangladesh.

32

MSO requirements, such as the penalty wage provision, were also inapplicable.  See id.

Disagreeing with the district court, Karim argues that the MSO does apply because of the clear language in the Shipping Articles (his contract with Finch), which stated that the Articles were "made pursuant to" the MSO.  Karim also points to the testimony of Finch's expert in which the expert stated:  "The provisions of the Shipping Articles are governed by [the] MSO." Finally, Karim asserts that several provisions of the Shipping Articles specifically refer to various MSO provisions.

As the district court correctly stated, the vessel in this case does not fit into any one of the four categories of MSO § 1(4).  The Shipping Articles do state that they were "made pursuant to" the MSO.  The plain reading of the terms "made pursuant to" indicates that the more reasonable interpretation is the one for which Finch argues — i.e., that the Shipping Articles fulfill the required elements of the MSO (and not that the Shipping Articles mandate that all the MSO requirements be applicable to the seaman).  This interpretation also does not create conflict with § 1(4).

Therefore, the district court did not err in determining that the MSO is inapplicable in this case.

### F. The United States Penalty Wage Statute

Factual determinations regarding the penalty wage statute are "subject to the clearly erroneous standard of review."

33

Castillo v. Spiliada Mar. Corp., 937 F.2d 240, 243 (5th Cir. 1991).

"The Seamen's Wage Act, 46 U.S.C. § 10313, protects seafarers by ensuring they receive timely payment of wages." Mateo v. M/S KISO, 41 F.3d 1283, 1289 (9th Cir. 1994) (internal quotations and citations omitted). The statute explicitly applies to foreign seamen in United States ports. See 46 U.S.C. § 10313(i) (2001). As such, their wages are necessarily determined by the foreign law under which they were paid (in this case, Bangladeshi law). Cf. Mateo, 41 F.3d at 1290 (stating that "defendants acted in good faith by abiding with the dictates of Philippine law and long-standing custom in paying off the seamen after they had returned to the Philippines").

On June 23, 1999, the district court orally granted Finch summary judgment on Karim's claim regarding the United States penalty wage statute. Denying Karim's request for reconsideration of this ruling, the district court reiterated its statement from the initial hearing that Karim's "assertions of disputed facts [as to owed wages] . . . ., unsupported by competent evidence, are not sufficient to survive a motion for summary judgment." Karim v. Finch Shipping Co., No. CIVA954169REF, available at 1999 WL 605481, at *1 (E.D. La. Aug. 11, 1999). The court also stated that the newly proffered affidavit for reconsideration would be disregarded because it was untimely (given that Karim had over three years to adduce

34

evidence on this issue).  See id.  The district court further stated that "Karim was unable to offer any credible factual dispute to Finch's contention that all wages for work he had actually performed were paid upon his discharge."  Id.

We find no fault with the district court's disposition of Karim's claim in this regard.  We also note that Karim's argument on appeal that his right to wages has been established by the MSO and the Shipping Articles is unavailing: we have upheld the district court's determination that the MSO is inapplicable, see supra Part III.E, and we also agree with the district court's determination that Karim was not owed wages under the Shipping Articles, see Karim I, 94 F. Supp. 2d at 744 n.10.  Thus, there is no debt for wages under Bangladeshi law upon which Karim could base a claim for penalty wages.  Therefore, the district court did not err in granting summary judgment on Karim's claim under the United States penalty wage statute in favor of Finch.

G. Maintenance Under the Employment Contract, the Merchant Shipping Ordinance, or the United States General Maritime Law

Karim claims that his contract with Finch, i.e., the Shipping Articles, provide that, if he is injured, Finch would pay his maintenance expenses until his return to Bangladesh.  He also states that the MSO and United States general maritime law impose similar requirements.  In fact, under United States law, a shipowner is required to pay the maintenance expenses of an injured seaman until he reaches maximum medical improvement.

35

Karim asserts that he provided undisputed testimony that he incurred such expenses in the amount of $34,900.

The district court did not explicitly address this claim, likely because Karim did not prove the amount of maintenance to which he was entitled. Although Karim refers to his maintenance expenses in some portions of his testimony at the bench trial, we have been unable to locate the $34,900 figure in the record. As such, this claim is not properly before us.[23]

## H. Prejudgment Interest

The district court noted first that the limitation action was stayed at Karim's request so that he could pursue his claims in state court. See Karim I, 94 F. Supp. 2d at 745. The court then held that prejudgment interest should commence from the date the limitation action was reactivated in the federal court. See id.

Karim disputes this determination, stating that interest should have been awarded from the date of his injury. Karim maintains that the district court based its decision on the erroneous premise that the renewal of his state court action operated as a stay of the limitation proceeding. Karim argues

---

[23] We also note that the district court's determinations implicitly precluded a recovery for maintenance expenses. As the MSO has been found inapplicable to Karim's situation, see supra Part III.E, maintenance based on the MSO was not possible. Basing maintenance on the United States general maritime law is also not tenable because the district court had determined that the choice-of-law analysis pointed to Bangladeshi law.

36

that the district court's order permitting Karim to pursue state court litigation did not prohibit Finch from proceeding with its limitation action.

As the district court correctly stated, the award of prejudgment interest is discretionary (both under Bangladeshi and United States law). See id. Under this standard, we find that the district court did not abuse its discretion in setting the initial date of the interest accrual to be the date this limitation action was reactivated in federal court.

### I. Litigation Costs, Including Attorneys' Fees

The district court stated that, under Bangladeshi law, litigation costs, including attorneys' fees, are discretionary and depend in large part on the counsel's effort and the outcome of the litigation. The court also noted that contingency fees are disfavored in Bangladesh, and attorneys' fees are to be based upon the work of the attorney. As such, the district court concluded that Karim should be awarded litigation costs, including attorneys' fees, in the amount of $70,000.

Karim complains that the district court provided no analysis and summarily determined the amount of the award. Karim asserts that this court has previously remanded and required a district court to prove its reasons in awarding attorneys' fees. Karim fails to mention that the cases it cites concerned fees awarded under United States law. Karim goes on to state that the unilateral award was in direct contravention of the understanding

37

between the parties and the court (i.e., that should the court determine that Karim was entitled to attorneys' fees and costs, the amount would be determined by referral to a magistrate judge). Such a referral is also in line with Bangladeshi law, which provides trial courts with the discretion to refer fee determinations to magistrates. Karim points out that the record demonstrates that attorneys' fees alone in this case are over $200,000 and that the costs are substantial. Karim argues that the amount received is so low as to constitute an abuse of discretion.

Finally, Karim argues that he is entitled to costs pursuant to Rule 54(d)(1) and 28 U.S.C. § 1920, regardless of the fact that foreign law governed the underlying claims. He points out that the district court's decision is ambiguous regarding whether the amount awarded included Rule 54(d)(1) and § 1920 costs. At a minimum, he requests that this court enter an order clarifying that he is entitled to file a motion to recover costs under Rule 54(d)(1) and § 1920.

Although there may have been an "understanding" that a fees and costs determination would be referred to a magistrate judge, a district court is not required to make such a referral. While such an action may assist in assessing the amount to be awarded, a district court may rely on the record before it. Therefore, an alleged contravention of this "understanding" is not per se error. In addition, the district court set out the factors

guiding its discretion as to the award of attorneys' fees and litigation costs.

The short answer to Karim's claim regarding his entitlement to costs recoverable under Rule 54(d)(1) and § 1920 is that Karim never filed a bill of costs in the district court or in any way raised his entitlement to those costs in the district court.

## IV.  CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.  Each party shall bear its own costs.